Hunter vs. Bosworth and others, imp.

APPEAL TO SUPREME COURT. *(1) Rights of a defendant on appeal of his co-defendant.*

CHATTEL MORTGAGE. *(2) Mortgage of after-acquired goods creates no lien. (3, 4) Mortgage with covenant for further assurance: When such assurance given one party or privy enures to benefit of all. (5) Who bound by contents of mortgage.*

1. In the appeal of one of several defendants, with adverse interests, the plaintiff, *prima facie* at least, is the "adverse party" of the statute, respondent here *(N. W. Ins. Co. v. Park H. Co.*, 37 Wis., 125); but the other defendants, though not parties, are privies to the appeal, and, upon proper application here, would be admitted to all the rights of practice of respondents.

2. The rule (established in *Comstock v. Scales*, 7 Wis., 159, and subsequent cases in this court) that a chattel mortgage of after-acquired goods creates no lien, legal or equitable, by force of the mortgage, upon such after-acquired goods, adhered to.

3. Where a chattel mortgage contains a covenant for further assurance, to extend the lien to after-acquired goods, a subsequent mortgage on after-acquired goods, executed to one of the mortgagors for a separate debt, will enure to the benefit of them all as additional security to the original mortgage.

4. Under this rule, where notes secured by a chattel mortgage with such covenant for further assurance, are held in severalty by different owners, a mortgage of the after-acquired goods, executed to one of such owners for a separate debt, enures to the benefit of all.

5. One who, not being a party to a mortgage, claims under it, is bound by everything it contains, as a privy to it.

APPEAL from the Circuit Court for *Milwaukee* County. In April, 1874, plaintiff sold a stock of goods in Ripon, Wis., to the defendant Frederick P. Hanchett; and the latter, to secure payment of part of the purchase price, gave plaintiff his three promissory notes of the same date: the first for $1,200, payable in one year; the second for $1,000, payable in two years; the third for $1,000, payable in three years; all with interest at ten per cent., payable annually. To secure these notes, he gave plaintiff a mortgage of said stock, with

power of sale upon default. Following the description of the merchandise, in the mortgage, are these words: " and all such other articles and stock as I may hereafter purchase and add to said stock. And I hereby agree that this mortgage is also to be extended or renewed so as to include and cover all such hereafter-purchased stock, till said sum of $3,200 is fully paid."

In July, 1874, plaintiff, having received from Hanchett a payment of $300 on the first note, and being indebted to the firm of " H. Bosworth & Sons " in a sum equal to the amount then due on said note, indorsed and transferred it to that firm, informing them at the same time that said note, with the two others above described, was secured by said chattel mortgage. Said firm consists of the defendants *F. J. Bosworth*, *B. B. Hopkins*, and *E. C. Hopkins;* and said note was held for the firm by *B. B. Hopkins*, at the commencement of this action.

In August, 1874, plaintiff, being then indebted to the defendant Alfred L. Cary in the sum of $509.04, indorsed the second note to him as collateral security; and at the commencement of this action, Cary held said note as such security, having received thereon from Hanchett the first year's interest. The defendant Palmer also owned an interest in said note, having garnished Cary on an execution upon a judgment against the plaintiff for $550.35. When this action was tried, there was due and unpaid on the second note, $1,193.88; there was due from plaintiff to Cary, $500.95; from plaintiff to Palmer, $652.43. Plaintiff was the owner of the third note, on which there was due $1,193.88.

After purchasing said stock, Hanchett carried on a retail drug business at Ripon until about December 1, 1875, purchasing additional goods from time to time, to replenish his stock, and making such purchases largely from the firm of " H. Bosworth & Sons," who were wholesale druggists in the city of Milwaukee. On the 20th of November, 1875, he owed

said firm on account for such purchases, $568.73. The defendant *B. B. Hopkins* claims to have owned that indebtedness since the date last mentioned; and on that day Hanchett executed to him a second mortgage upon his entire stock of goods in his drug store at Ripon, to secure payment of the first note above described (of which *Hopkins* claims to be the owner), and of said further sum of $568.73, with interest at ten per cent.; said mortgage empowering the mortgagee to take possession and sell at any time to make the amount secured.

The answer of the defendants *Bosworth, B. B. Hopkins* and *E. C. Hopkins* denies that at the time of the execution of this second mortgage, they or either of them had knowledge of the provisions and contents of the mortgage to plaintiff first above described, and particularly denies knowledge of that part of it which provides for security upon the after-acquired goods, but admits "that they were informed of the existence of a chattel mortgage on Hanchett's stock to secure his notes."

On the 1st of December, 1875, plaintiff took possession of Hanchett's stock under his mortgage; on the 8th of the same month, the defendant *Hill*, as sheriff, took possession of said stock under a writ of attachment, and afterwards turned over possession thereof to " H. Bosworth & Sons," upon the two chattel mortgages, and they advertised a sale of it under such mortgages, to be made on the 28th of the same month. On the 27th of that month, plaintiff brought this action, alleging, in addition to the facts already stated, that the firm of " H. Bosworth & Sons " intended to sell all of said goods without separating those constituting the original stock purchased by Hanchett from those subsequently acquired by him; that they intended to make such sale for their own benefit, without regard to the interest or rights of the plaintiff or other parties above named; that the amount realized by such a sale would not be sufficient to satisfy the three notes above described;

and that Hanchett was insolvent, etc.   He therefore demanded
that a receiver should be appointed to take possession of the
property and sell it; that the amounts found due the several
parties interested might be paid them according to their re-
spective priorities; and that the defendants *Bosworth* and
*B. B.* and *E. C. Hopkins* might be enjoined from making
the threatened sale, or further interfering with said stock.

The answer of *Bosworth* and the *Hopkinses* alleges that
they intended to separate the goods of the original stock from
the after-acquired goods, and to sell the latter first.   It seems
that Cary and Palmer also answered, setting up their respective
interests in the property sold, and claiming payment of their
demands from the fund.

After the granting of the temporary injunction prayed for,
a receiver of the whole stock was appointed by consent of
parties; and, under the order of the court, he sold the property
at private sale, realizing for the goods of the original stock,
$1,300, and for the after-purchased goods, $1,000; and he
thereupon paid to *B. B. Hopkins* the amount due him on the
first note ($1,064.46), and also paid the costs of the proceed-
ings to foreclose the mortgages and of the receiver's sale
($326.86); and held the remainder ($908.68) until judgment.

The court held, 1. That the mortgage given to the plaintiff
is in equity a lien upon all the property sold by the receiver,
and that the agreement therein for the extension and renewal
thereof must be considered performed.   2. That the sum re-
maining in the receiver's hands should be paid into court, and
distributed by the clerk, first, to pay the taxable disburse-
ments in this action, and secondly, in part payment of the
second note: $500.95 to be paid to defendant Cary, and the re-
mainder to the defendant Palmer.   3. That the first note should
be regarded as paid, from the date of payment of the amount
due thereon by the receiver to *B. B. Hopkins.*

The defendants *Bosworth* and *B. B.* and *E. C. Hopkins*
appealed.

The cause was submitted for the appellants on briefs of *Carpenter & Smiths*. They contended, that, by the settled law of this state, that clause in the mortgage to plaintiff granting after-acquired articles, and the agreement therein that the mortgage should be extended or renewed so as to cover stock purchased thereafter, created no valid obligation *either in law or equity (Chynoweth v. Tenney*, 10 Wis., 397, 404; *F. L. & T. Co. v. Bank*, 11 id., 207, 209; *Single v. Phelps*, 20 id., 398, 402; *Mowry v. White*, 21 id., 417, 421; see also 40 Me., 270, 564; *Williams v. Briggs*, 16 Albany L. J., 387); that some of the cases elsewhere seeming to hold a different doctrine, are cases where a mortgage has been held good against the crops to be raised from lands simultaneously mortgaged, or where other products to arise from mortgaged property are treated as bound. by the mortgage (11 Wis., 212; 9 B. Mon., 124; 41 N. H., 456; 10 Met., 488; 8 Barb., 102; 34 id., 9; 19 Wall., 544; Herman on Chat. Mort., 86–88, and cases cited in notes); that *Putnam v. Cushing*, 10 Gray, 334, and *Holly v. Brown*, 14 Conn., 264, deny the lien on after-acquired property except in such cases; that the cases in which railroad mortgages including after-acquired rolling stock, etc., have been held to create a valid lien upon such rolling stock, mostly depend upon the charters, or upon the principle that, a franchise being lawfully mortgaged, property acquired by virtue of it is included in the mortgage, as incidental to the hypothecation of the franchise *(Pierce v. Emery*, 32 N. H., 484; *Pierce v. Railroad Co.*, 24 Wis., 551; *State v. Railway Co.*, 3 Rob. (La.), 513; *Coe v. McBrown*, 22 Ind., 252; 25 Barb., 484; Herman on Chat. Mort., 98, cases cited in note); that the covenant adds no force to the grant of the after-acquired property, since, if such a covenant were valid, the grant would be upheld at least in equity without the covenant, being treated in itself as a covenant *(Barnard v. Eaton*, 2 Cush., 294, 303; *Codman v. Freeman*, 3 id., 306, 309); that no equitable lien can be created by an agreement which is

in itself void, and only those agreements can be treated in equity as executed *which are capable of being enforced by a court (Phelps v. Murray,* 2 Tenn. Ch., 746); that the chattel mortgage, although on file, was not constructive notice of any provisions except those which created liens upon property owned by the mortgagor at the time of making the mortgage (10 Met., 493; 20 Wis., 401), and appellants had neither actual or constructive notice of the covenant in question, and were not parties to it, but, as purchasers of the first note, were assignees of the mortgage only to the extent of that note; that, as to the indebtedness afterwards accruing to them from Hanchett, they were as free to get the best securities they could, as any strangers would have been; and that, if the plaintiff or Cary had ever had the right to enforce the agreement for an extension of the security to after-acquired goods, they *waived* it by delay until Hanchett had become largely indebted to the appellants and others, and had become insolvent.

For the respondent, a brief was filed by *Dixon, Hooker, Wegg & Noyes,* and there was oral argument by *A. L. Cary.* They contended, 1. That no appeal had been taken as to the defendants Cary and Palmer, and therefore the judgment, so far as it directs the payment of money to them, could not be disturbed; and that Cary and Palmer were clearly adverse parties within the meaning of the statute providing for service of notices of appeal.  Sec. 3, ch. 264 of 1860.  2. That aside from payments to Cary and Palmer, the judgment only directs payment to plaintiff of certain taxable disbursements in this action; and in equity cases the awarding of costs is always within the discretion of the court.  3. That the mortgage given to plaintiff was *in equity* a lien upon all the stock afterwards acquired by Hanchett; that the cases in this court holding that a chattel mortgage including after-acquired property is inoperative as to such property, were all actions at law, in which only the legal title was sought to be established; that

the *dictum* in *Chynoweth v. Tenney*, 10 Wis., 397, that such a mortgage did not entablish an equitable lien, was based upon certain English decisions there cited; that afterwards the house of lords, in *Holroyd v. Marshall*, 10 H. L. Cas., 191, unanimously held that a mortgage of property to be subsequently acquired, attached in equity as soon as the property came into existence; that in *Pierce v. Railroad Co.*, 24 Wis., 551, it was held that a mortgage given by a railroad company including property afterwards to be acquired, was a lien upon real estate acquired by the company subsequent to the mortgage, from the moment the company acquired its interest, and a title under the mortgage was upheld as against the claim for a vendor's lien; and that there is no distinction upon this point between mortgages given by a railroad company and those given by individuals, the former being only empowered by their charters to do what an individual has an inherent power to do (LOWELL, J., in *Brett v. Carter*, 3 Cent. L. J., 286). In further support of the proposition, that the mortgage to plaintiff created an equitable lien on the after-acquired stock, counsel cited *Mitchell v. Winslow*, 2 Story, 630; *Pennock v. Coe*, 23 How. (U. S.), 117; *Dunham v. Railroad Co.*, 1 Wall., 254; *Galveston Railroad v. Cowdrey*, 11 id., 459, 481; *U. S. v. N. O. Railroad*, 12 id., 362; *Butt v. Ellet*, 19 id., 544; *McCaffrey v. Woodin*, 65 N. Y., 459, 465; *Barnard v. Railroad*, 3 Cent. L. J., 608; id., 711; *Leland v. Coliver*, 4 id., 7; *Smithurst v. Edmonds*, 13 N. J. Ch., 408. They further contended that appellants, as holders of the first note secured by the mortgage to plaintiff, were parties to it and to all its terms and conditions.  4. That equity will regard Hanchett's agreement to extend and renew the mortgage so as to include after-purchased stock, as having been executed the moment he acquired such stock.   *Craig v. Leslie*, 3 Wheat., 563; Broom's Leg Max., *502; 1 Story's Eq. Jur., 64 g.

The appellants' counsel, in reply, insisted that the declaration in *Chynoweth v. Tenney*, to the effect that no equitable

lien is created by a mortgage on after-acquired goods, was not merely a *dictum*, but an express decision of a question actually arising in that case, the action having been brought under the code, so that an equitable defense was as good as a common-law defense (10 Wis., 398, 403); that in a subsequent chattel mortgage case, in 11 Wis., 209, it is expressly stated that this point was decided in *Chynoweth v. Tenney;* that the same doctrine was reaffirmed in *Single v. Phelps*, 20 Wis., 398, and *Mowry v. White*, 21 id., 421, and these decisions cannot be affected by subsequent decisions elsewhere; and that the appellants could not be bound by covenants of which they were ignorant in fact, and which were at the same time void in law. *Smith v. Widlake*, 26 Weekly Rep., No. 4, p. 52; *S. C.*, 5 Reporter, No. 3, p. 95.

The following decision was rendered on the 28th of February, 1878:

RYAN, C. J.   The appellants were undoubtedly entitled to their appeal, whatever its effect upon their codefendants. And, *prima facie* at least, the plaintiff below is the adverse party of the statute, respondent here.   It is true that there is an adverse interest in the codefendants of the appellants, who are not nominally parties to the appeal.   So it was in *N. W. Ins. Co. v. Park H. Co.*, 37 Wis., 125, where we pointed out the difficulty.   We cannot amend the statute to meet such a case as that or this.   We can only administer it as we find it. The codefendants of the appellants, however, though not parties, are privies to the appeal, because parties to the record below. And they would have been entitled, upon proper application here, to all the rights of practice of respondents.   They saw fit, however, to make no such application; appearing to rely on the nominal respondent for the assertion of their rights.

The learned counsel for the respondent appealed to us to reverse the rule of this court in *Comstock v. Scales*, 7 Wis., 159;

*Chynoweth* v. *Tenney*, 10 id., 397; *Farmers' L. & T. Co.* v.
*Com. Bank*, 11 id., 207; *Single* v. *Phelps*, 20 id., 398; *Mowry*
v. *White*, 21 id., 417, and perhaps other cases, that a chattel
mortgage of after acquired goods does not create a lien, legal
or equitable, by force of the mortgage, upon after acquired
goods.  The argument was learned and interesting.  It went
upon the assumption that this court had followed earlier En-
glish cases, now overruled in England, and American cases
elsewhere following the English.  The assumption is not al-
together accurate; for an examination of the cases will show
that the rule was rested here on general principle as well as
on authority.  And we certainly are not now inclined to
change the strict rule so long established here, merely because
courts elsewhere have abandoned it.

Whether, and in what cases, chattel mortgages containing
express covenants for further mortgages to cover after ac-
quired goods, could be specifically enforced, where there
are no intervening adverse rights, after the goods have been
acquired, is a question we need not consider here.  For
in this case the original chattel mortgage contained an express
covenant for further assurance, to extend the lien to after ac-
quired goods; and a new mortgage was actually executed upon
after acquired goods, to one of the mortgagees, to secure a sepa-
rate debt.  And we cannot doubt that the second mortgage
enured as additional security to the original mortgage.

We say that the second mortgage was executed to one of
the original mortgagees.  The mortgage secured three prom-
issory notes, maturing at different times; the appellants hold-
ing the first in order of maturity, their codefendants the sec-
ond, and the respondent the third.  So these parties were all
mortgagees in right, with priorities of lien in the order stated.
The second mortgage was executed to the appellants, who now
claim under it adversely to their co-mortgagees in the first
mortgage.

Although the mortgagees in the first mortgage held the

notes secured by it in severalty, they held the security in common.   This established, *quoad* the mortgage, a community of interest, a relation of trust and confidence between them, to support the common security in all proper ways, and to do nothing to divert or impair it.   This equitable rule of good faith, we take to be as well recognized in mercantile ethics as in courts of equity.   And, whether or not the covenant for further assurance in the first mortgage could have been specifically enforced, the mortgagees were equitably bound to each other, if not actively to insist upon its performance, certainly to do nothing to defeat it.

Whether or not the covenant could have been enforced, the mortgagor was none the less morally bound to perform it. If it were an imperfect obligation, it was none the less an obligation *in foro conscientiæ*, and the mortgagees had at least a moral right to its fulfillment.   It would certainly have been bad faith in the mortgagor to refuse to fulfill it; and it certainly was bad faith in him to give the second mortgage adversely to the first, in violation of his covenant and moral duty.   So the mortgagees in the first mortgage were bound, in good faith to each other, to take the second mortgage, if they could obtain it, as additional security to the first.   And it certainly was not good faith to their co-mortgagees, for one of the parties to take the second mortgage for a separate debt, adversely to the common interest under the first mortgage.

These parties were entitled in common, under the first mortgage.   That gave them at least an imperfect title to a lien on after acquired goods of the mortgagor.   And neither of them can be tolerated in acquiring an adverse title against his co-tenants.   In the language of KENT, C.: "It is not consistent with good faith, nor with the duty which the connection of the parties, as claimants of a common subject, created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole subject to himself, and thus undermine and oust his companion.

It would be repugnant to a sense of refined and accurate justice.  It would be immoral, because it would be against the reciprocal obligation to do nothing to the prejudice of each other's equal claim, which the relationship of the parties, as joint devisees, created.  Community of interest produces a community of duty, and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding incumbrance, or an adverse title, to disseize and expel his co-tenant.  It cannot be tolerated, when applied to a common subject, in which the parties had equal concern, and which created a mutual obligation to deal candidly and benevolently with each other, and to cause no harm to their joint interest."  *Wright v. Sperry*, 21 Wis., 331; *Van Horne v. Fonda*, 5 Johns. Ch., 388; *Page v. Webster*, 8 Mich., 263.  The rule rests, not upon the strict relation of joint tenants, or tenants in common, but upon community of interest in a common title, creating such a relation of trust and confidence between the parties, that it would be inequitable to permit one of them to do anything to the prejudice of the others.  *Rothwell v. Dewees*, 2 Black, 613.

It is quite immaterial here, whether the mortgagees in the first mortgage could have obtained the second mortgage, as further assurance under the first.  They certainly might have received it.  And it is enough to hold that, on principles universally recognized and applied, one of the mortgagees in the first mortgage cannot, in a court of equity, claim under the second mortgage adversely to the common interest under the first.

The learned counsel for the appellants claimed that his clients were not privies to the covenant in the original mortgage.  They claim under that mortgage in this suit, and are bound by all that it contains.  Every one is charged with notice of the paper title under which he claims.

We therefore hold that the appellants cannot, in good conscience, appropriate the proceeds of the second mortgage to

their separate debt; but took the second mortgage in trust to apply the proceeds on the first mortgage, until that should be satisfied.

Some minor questions were made, which are not properly before us, because there is no bill of exceptions. We have nothing here but the pleadings, the findings of fact, and conclusions of law.

*By the Court.* — The judgment of the court below is affirmed.

On the 19th of March the appellants filed a motion for a rehearing, and submitted it on the 9th of April. The brief of *Winfield Smith,* filed in support of the motion, argues that, by former decisions in this state, adhered to in the foregoing opinion, the mortgage as to after-acquired goods created no lien, legal or equitable; that this is equivalent to saying that, whatever might have been the *moral* duty of the mortgagor, he owed the mortgagee no duty of legal or equitable cogni-zance, as to such goods; that it follows as a necessary corollary, that if a stranger to the first mortgage, *with full notice* of its existence and provisions, had taken a mortgage of the after-acquired property, he would have been protected as against the plaintiff; that this is for the reason that courts enforce those rights only which have a basis in *law* (whether technically called equitable or legal), and refuse to entertain claims based solely on moral obligations; that if appellants could not take a separate mortgage, it must be because of some *legal* or *equitable* (not merely *moral)* principle, which applies to them and not to a stranger; and that none of the cases cited in the foregoing opinion, when carefully examined, establish any such principle. Counsel further contended, 1. That the rule of equity asserted in those cases applies only to a claim by cotenants "*to a common subject;*" and this means a subject in which they all have a common interest *at law or in equity:* that the only common subject in the case

at bar, in which the parties had any such interest, was the property on which the mortgage created a lien; that no act done by either cotenant in this case respecting the after-acquired goods could possibly prejudice any right of the other cotenants, because none of the cotenants, as such, had any rights in such goods; that while it is true, as suggested, that the holders of the first mortgage *might have received* a subsequent mortgage, that is equally true of *every other creditor*, and every other creditor had just as much right to it, in the eyes of a *court*, as they; that if they had no enforceable right to such further mortgage, they stood in respect to such after-acquired goods precisely as if the latter had been wholly omitted from the first mortgage; and that it would be a strange anomaly if an obligation not within the scope of judicial power to enforce against the maker, could be enforced on behalf of the obligee against his assignee. 2. That to make the equitable principle in question applicable, there must not only be a common subject and an imperfect title, but *possession* under such title, and where persons have only an imperfect title to a common subject, without possession or a right to reduce to possession, each one is free to do the best he can for himself. *Van Horne v. Fonda*, 5 Johns. Ch., 406; *Wright v. Sperry*, 21 Wis., 329, 337–8; *Venable v. Beauchamp*, 3 Dana, 324; *Coleman v. Coleman*, id., 404. In this case the thing held in possession, the thing enjoyed, the thing as to which the holders of the first mortgage had a common title, is the *lien* on the mortgaged goods existing at the date of the mortgage. As to the subsequently purchased goods, they had no lien, no right known to a court (beyond the right of any other creditor), no *jus in re*, no *jus ad rem*, no possession of the goods nor of any interest in them, no enjoyment of anything, by virtue of that part of the mortgage.

The plaintiff's counsel objected that the motion for a rehearing was not submitted within twenty days after it was filed, as required by rule 20 of this court.

RYAN, C. J. The motion for rehearing is seldom abused, as an opportunity for scolding the court. It can not properly be said that it is so in this case. But the learned counsel who makes the motion, opens his argument with this singular sentence:

" The series of misfortunes which I have latterly met with at the hands of this court, has shaken my confidence in the result of any effort I may make to convince the court, or to obtain its favorable judgment in any case where a serious contest is possible."

The fact may be as stated, though the late volumes of reports do not quite appear to verify it. But the suggestion is not fair either towards the learned counsel himself or towards the court. For it may be an imputation of failure in the intelligent discharge of duty equally to either. It does not seem to have occurred to the learned counsel that the misfortune of which he complains may be attributable to his clients, or to the work which they give him to do. A great judge once said that great lawyers were frequently unsuccessful; for the reason that, being generally expensive luxuries, they are apt to be employed only in desperate cases. This may be the occasion of the learned counsel's complaint, and his consolation.

The learned counsel has made an ingenious and interesting argument, presenting the point on which the judgment of this appeal turned, in a light not suggested on the hearing. Had it been then presented, or were it now presented in time, it would be entitled to the careful consideration due to every lawyer-like argument. But unfortunately, as the learned counsel for the respondent objects, it comes too late. And the court has lost jurisdiction to consider it, or to entertain the motion, or to deny it with costs. *Pierce v. Kelly,* 39 Wis., 568; *Diedrich v. Railway Co.,* 42 id., 274.

It is hoped that the learned counsel will not accept this ruling as a continuation of his series of misfortunes at the hands of the court.

*By the Court.* — Motion denied without costs.