## NICHOLSON v. H. POEHLER CO.

(District Court, D. South Dakota, S. D. November 10, 1922.)

1. **Warehousemen ⬧⇒25(1)—Only required to turn over equal quantity of grain of same grade at the warehouse or the terminal market.**

Under Rev. Code S. D. 1919, §§ 9751, 9753, 9754, 9758, 9760, relative to grain warehouses, which recognize the inadequacy of warehouse facilities and the necessity of transferring grain to the terminal market and selling it, the holder of a storage ticket is not entitled to restoration of the identical grain stored, and cannot demand it at the elevator where it was stored, and the warehouseman is only required to deliver an equal number of bushels of like grade, either at the elevator or at the terminal market.

2. **Embezzlement ⬧⇒11(1)—Warehousemen ⬧⇒34(2)—Not liable for conversion or guilty of larceny until failure on demand to deliver wheat or pay market price.**

Under Rev. Code S. D. 1919, §§ 9751, 9753, 9754, 9758, 9760, a warehouseman is not liable for conversion or guilty of larceny, unless he fails on demand to deliver wheat or pay its market price, and the mere fact of a sale or transfer of the wheat to the terminal market is not a violation of his rights or duties.

3. **Warehousemen ⬧⇒25(7)—Commission merchant, selling grain for warehouseman, held to incur no liability to holder of storage ticket.**

As a warehouseman, under the South Dakota statutes, had a right to ship grain stored with him to the terminal market and sell it, a commission merchant incurred no liability to the holder of storage tickets in making the sale for him.

4. **Warehousemen ⬧⇒25(3)—No failure to comply with obligations until demand made.**

Under the South Dakota statutes, no duty to deliver wheat or pay its value exists, and there is no failure on the part of a warehouseman to comply with his obligations, until there is a demand.

5. **Subrogation ⬧⇒26—President of bonding company, taking up storage tickets, held to have no greater rights against third person than the company.**

Where the president of a bonding company, which bonded a public warehouse under the South Dakota statutes, on default on the part of the warehouse company, took up storage tickets, expecting that the bonding company would reimburse him if he failed to recover from a commission merchant, who sold grain for the warehouseman, his rights were no other or different than those of the bonding company itself.

At Law. Action by Charles L. Nicholson against the H. Poehler Company. Judgment for defendant.

James M. Brown, of Aberdeen, S. D., for plaintiff.
H. V. Mercer, of Minneapolis, Minn., for defendant.

ELLIOTT, District Judge (in memorandum). I have determined the issues in Charles L. Nicholson v. H. Poehler Company, in favor of the defendant and against the plaintiff.

[1] The provisions of the statutes of this state, and especially of sections 9751, 9753, 9754, 9758, and 9760, define the rights, duties, and obligations of warehousemen. I can find no basis in the decisions of this state or the decisions of the state of North Dakota construing similar provisions, for a construction of the rights and obligations of warehousemen, that justify the contention of the plaintiff in this case. In the light of the decision of the Supreme Court of this state in Street

⬧⇒For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

v. Farmers Elevator Co., 33 S. D. 601, 146 N. W. 1077, and National Bank v. Elkins, 37 S. D. 479, 159 N. W. 60, it cannot consistently be urged that one who holds a storage ticket is entitled to the restoration of the identical grain stored by him. In the former case the right to "market" the grain so deposited is recognized. Nor can it be seriously contended under the provision of this law, that the grain stored can be demanded at the elevator where it was stored. The North Dakota Supreme Court has said plainly that the provisions of this warehouse law recognize the usual and necessary custom of shipping grain out of the warehouse as the business may require, and it might well have added that the section recognizes the condition universally existing throughout the entire Northwest, to wit, that the elevators issuing storage receipts under these provisions of law are only large enough to accommodate sufficient grain to facilitate shipment of the grain under normal conditions, and that, whenever there is a shortage of cars or an obstruction of transportation, the elevators are blocked, and the marketing of grain necessarily ceases.

The statutes specifically provide that, as between the bailor and bailee, the title to the particular grain remains in the bailor. Only a casual reading of this statute demonstrates that, by the terms of the storage tickets, the person holding such tickets has a right to demand possession of the wheat of the grade deposited at the elevator, and, if the company storing it had it on hand, it would be compelled to turn the same over to him; but, if such storage company had not such grain in its possession, it would then be required to deliver an equal number of bushels of like grade, either there or at the terminal market. I am convinced that the purpose of the provision of the statute requiring a bond is a recognition of the necessity for the transfer of the wheat to a terminal market and the sale by the person storing it.

[2] The statute provides a punishment for the warehouseman who fails to comply with his duties as such warehouseman, and by statutory enactment he shall be guilty of larceny; but there is neither default nor guilt until he has failed to deliver the wheat or pay the market price upon demand. The mere fact of the sale of the wheat, or transfer of the wheat to the terminal market, is nowhere suggested a violation of the rights or duties of the warehouseman. It seems clear to me that the provisions of this law were enacted for the very purpose of permitting the warehouseman to take the grain, sell it, and carry it at a reasonable price for the producer, giving him the benefit of storage, knowing that, under the conditions that exist in this country, there is absolute impossibility of carrying the actual grain in the warehouse; that there are no warehouse facilities anywhere in this country to hold and carry the grain of the producers; that the warehouse facilities as I have stated above, are only sufficient for the ordinary marketing of the grain as it comes in, and not sufficient for that if anything out of the ordinary occurs to burden or hinder transportation.

[3] Clearly, if the warehouseman had a right to ship to the terminal market and sell, the defendant commission merchant incurred no liability in making the sale for him. I think this construction is entirely consistent with the provisions of the statute that, as between the par-

ties, the title to the particular grain remains in the bailor, as quoted in State v. Daniels, 35 N. D. 5, 159 N. W. 17, and Marshall v. Andrews, 8 N. D. 364, 79 N. W. 851. I am of the opinion that under these statutes, neither the shipping nor selling of the grain represented by the storage tickets in question constituted a conversion of the grain, and therefore that the defendants receiving and selling the same on commission could not be guilty of conversion thereof.

[4] The warehouseman cannot be held liable for conversion under these statutes until he has failed to comply with his obligation to the owner of the storage receipts by delivering to him an equal quantity of like grain at the elevator where it was stored, at the terminal market, or pay the value of the grain, and the failure is not sufficient because no duty to deliver the grain or pay its value is involved under this statute until there is a demand; at least, no present duty, and his failure to comply with his obligations as a warehouseman at the time of the demand constitutes the wrong, and that wrong is defined in this statute as larceny. This view is supported by the Supreme Court of North Dakota in First National Bank of Fargo v. Minneapolis & Northern Elevator Co., 11 N. D. 280, 91 N. W. 439, where it is said:

"A demand, followed by a refusal, would constitute a conversion."

To the same effect in St. Anthony & Dakota Elevator Co. v. Dawson & Byfield, 20 N. D. 23, 126 N. W. 1015, Ann. Cas. 1912B, 1337:

"Under the terms of the storage tickets, Spenst had the right to demand possession of such wheat, and the elevator company would be compelled to turn the same over to him, if in its possession and the same could be done, and if the same was not in its possession, and the identical wheat could not be delivered, it was compelled to deliver to Spenst an equal number of bushels of wheat of like grade. These matters are elementary, and no authorities need be cited in support of them."

In Marshall v. Andrews et al., 8 N. D. 367, 79 N. W. 852, where stored wheat had been destroyed by fire, in an action by the holder of the storage receipts, it was urged that a presumption arose that plaintiff's wheat was thus destroyed by that fire. The court said:

"We think this position is unsound, particularly in view of the well-known custom among warehousemen in this state to ship out grain that is received into the warehouse almost as soon as received, in order to make room for other grain that is constantly coming in."

The court thereafter recognizes the liability of the bailee to the bailor, upon the latter demanding the return of the property and making his proof, showing the refusal on the part of the former to comply with the demand, thus making a prima facie case against the bailee. The Supreme Court of South Dakota in National Bank of Wheaton, Minn., v. Elkins, 37 S. D. 486, 159 N. W. 62, uses the following language:

"It is undoubtedly true that under the provisions of the warehouse law (Pol. Code, § 488), where warehouse receipts are given for stored grain, the holder of the receipts may not require the restoration of the identical grain, but only grain of the same amount, kind, and quality."

The reasons justifying this statement of our Supreme Court are found in the provisions of the statute contemplating the shipment of

grain to terminal elevators, and the provisions of the statute with reference to what the receipt itself shall contain.

Attention is directed by plaintiff to the law of Minnesota. The Supreme Court of that state in Hall v. Pillsbury et al., 43 Minn. 33, 44 N. W. 673, 7 L. R. A. 529, 19 Am. St. Rep. 209, say that even in that state, under the law as it exists there, that:

"It is true, it may be the practice—probably is—of warehousemen to take out and dispose of grain without reference to the relation that the amount in the warehouse bears to the amount of the outstanding receipts. In other words, it may be their practice to dispose of the depositor's property. When this is done with the consent (such as the statute requires) of the depositors, it is, of course, rightfully done, and in that case a sale by the warehouseman would pass the title."

The statute of Minnesota justifying this statement of the court is quoted in the opinion as follows:

"No person receiving or holding grain in store shall sell, or otherwise dispose of, or deliver out of the storehouse or warehouse where such grain is held or stored, the same, or any part thereof, without the express authority of the owner of such grain and the return of the receipt given for the same, except as herein provided."

And it is further provided by the statute of Minnesota that, if the warehouseman be also a dealer in grain, his right to dispose, as his own, of grain in the warehouse is limited to that which belongs to him, and therefore can have no application to the specific provisions of the law of this state, which clearly recognizes the right to transfer the wheat to the terminal market, and "market" the same. Entertaining, as I do, this view of the proper interpretation of the rights of the parties under the statutes of this state, it follows that judgment should be entered for the defendant and against the plaintiff upon all of the issues.

[5] It seems fair to counsel for both parties that I should indicate my views upon the other propositions involved. I am of the opinion that, under the testimony in this case, there can be no question as to the character of the transaction by and through which this plaintiff came into the possession of these storage tickets. He went upon the stand and very frankly stated that he took possession of them because he and others interested in this surety company, that had bonded this defaulting warehouse company, thought that the best way to handle the matter; that is, to handle the defalcation on the part of the bonded warehouseman in the controversy involving these particular receipts. Clearly this bond was given for the benefit of these receipt holders, the default had been made, the grain was not in the warehouse, nor could it be had at the terminal elevator, and they had defaulted upon demand. Thereupon this plaintiff gave his check for $8,000, the amount of the bond. He states affirmatively that, in the event he cannot recover this amount from the defendant, he expects the bonding company to pay him. It is concededly an attempt to do indirectly that which cannot be done directly. It is an attempt on the part of the president of the company, the plaintiff in this case, interested in its management, to take these certificates in his own name, after default, after the demand has been made upon the defaulting company after the liability of the bonding company has been fixed in so far as the action of

the holders of the certificates was concerned by proper demands, and thus protect the bonding company by requiring payment to him by this defendant of the amount of money that he had advanced to the holders of the receipts, for the protection of the bonding company.

The motive of the plaintiff is plainly to protect the bonding company. The interest of the plaintiff in taking the receipts was his interest in the bonding company, and there might be some reason to say that, notwithstanding that interest, he had a right to make the investment; but clearly he had not the right to make the investment with the thought, or upon the theory, and with the intent and purpose that the bonding company was to reimburse him if he failed to recover from the defendant. His act thereby became the act of the bonding company, and his rights as a plaintiff here are no other or different than the bonding company itself, and I think it is conceded by all parties that no recovery could be had if the bonding company itself had made the payment to these receipt holders.

I think it may be said with considerable force that this plaintiff, under the conceded facts in this case, in effect, paid this legal obligation of the bonding company; that there was no liability on the part of the plaintiff to pay it. He was a mere volunteer. The president of this bonding company, the plaintiff here, when he paid the holders of these receipts, had no interest of his own to protect, and such payment was purely voluntary, made for the purpose of protecting the bonding company, and with the expectation of reimbursement from the bonding company, if plaintiff failed to recover from this defendant. He thus assumed the position of the bonding company, and his rights are limited to those of the bonding company itself, if it had made the payment direct.

You may draw and forward judgment of dismissal, giving the plaintiff proper exception.