SOUTH DAKOTA WHEAT GROWERS' ASSN., Respondent, v. FARMERS' GRAIN CO. of Firesteel, Appellant.

(237 N. W. 723.)

(File No. 7139.   Opinion filed July 17, 1931.)

*Clark & Dillman,* of Yankton, for Appellant.

*Van Slyke & Agor,* of Aberdeen, for Respondent.

*M. Q. Sharpe,* Attorney General, and *Herman L. Bode,* Assistant Attorney General, both of Pierre, for Board of Railroad Commissioners.

RUDOLPH, J. This is an action brought to recover the value of approximately 13,000 bushels of durum wheat. The action was tried to the court, judgment was entered for the plaintiff, and, from an order denying a motion for a new trial, the defendant has appealed. There is no material dispute in the facts. The defendant elevator company was engaged in the grain warehouse business at Firesteel, S. D. The plaintiff is the owner of a large number of grain warehouse receipts issued by the defendant elevator company during the fall of 1928. The plaintiff on January 18, 1929, made a demand upon the defendant company for a delivery of the wheat represented by the receipts, at Firesteel, S. D. The defendant company through its manager advised the plaintiff that it could not deliver this wheat at Firesteel, whereupon the plaintiff demanded delivery at Minneapolis, Minn., claiming that Minneapolis was a terminal market within the meaning of section 9753, Revised Code of South Dakota for the year 1919. The plaintiff at the time of making its demand tendered the warehouse receipts and storage charges against the stored grain, and later deposited the receipts and the storage charges in the Bank of Timber Lake at Timber Lake, S. D., which bank was agreed upon by the parties. The plaintiff did not tender any freight charges. The defendant refused to deliver the durum wheat at Minneapolis, and gave as its reasons therefor that it was unable to deliver this particular kind of wheat at Minneapolis, and further that Minneapolis was not a terminal market within the meaning of section 9753 for this particular kind of wheat. The wheat represented by the tickets was wheat known to the wheat trade as "exportable durum." The evidence further disclosed, and the court found as a fact, that on January 18, 1929, the date upon which the demand was made by the plaintiff for the redelivery of the wheat, the defendant corporation had no wheat either in its warehouse at Firesteel, S. D., or at any terminal market, of the kind, grade, and quality described in the warehouse receipts, and that prior to January 18, 1929, the defendant corporation had shipped and sold all of the durum wheat

described in the warehouse receipts. The defendant in its answer and at the time that demand was made upon it for the durum wheat covered by the receipts offered to make delivery of the same grade, kind, and quality of wheat at Duluth, Minn.

The first question presented is whether Minneapolis, Minn., is a terminal market within the meaning of section 9753, which section in part provides as follows: "In the event of conditions arising that would prevent such warehouse or elevator from delivering the grain covered by such receipts, at its elevator, it shall have the right to make the delivery at the terminal market which the owner of such receipts may designate, where such warehouse or elevator ships its grain."

Neither party to this action has attempted to give any definition of a terminal market, and we have been unable to find any such definition. If the term "terminal market" has any general or accepted meaning, there has been no attempt to bring that before this court. It is necessary, therefore, to look to the law itself, and the manner in which the grain business is conducted, and determine the meaning of the term "terminal market" as used in the statute.

There are certain facts in the system of grain marketing that are generally recognized. In the marketing of grain, the grain is first deposited in the local or country elevators. These elevators are only large enough to accommodate sufficient grain to facilitate marketing, and a shipment of the great bulk of the grain to the large or central markets is necessary. Having been received into the local or country elevator, the grain is there loaded into cars and shipped to the large market where there are great elevators to store and hold this grain, and it is there deposited in one of these great elevators and a warehouse receipt issued covering the grain. Through this receipt the grain goes into commerce, and it may be sold and resold many times with the transference of this receipt. From this central market it is finally again loaded into cars or ships and sent to its final desination. At these central markets large stocks of this grain accumulate in these great elevators, and it is there available for the trade.

██ Our statute contemplates a delivery of the grain, not the identical grain, but only grain of the same amount, kind, and quality. National Bank of Wheaton, Minn., v. Elkins, 37 S. D.

479, 159 N. W. 60. The warehouse receipt, in form prescribed by the Board of Railroad Commissioners, provides for a redelivery of the grain, or grain of like amount, kind, and quality. In view of this fact, that is, that the statute and the contract between the parties contemplates a redelivery of grain of like amount, kind, and quality, either at the elevator or at the terminal market, it is only reasonable to conclude that in the use of the term "terminal market" the law designates that place where the particular kind of grain in the ordinary and natural course of the trade accumulates in the large elevators in storage, where large stocks of this grain are available, and the transfer of the grain is accomplished by a transfer of the warehouse receipt issued against it.

The facts in this case with reference to whether or not Minneapolis is a terminal market, for the particular kind of grain covered by the storage tickets, are not in any material manner in dispute. The grain was described as No. 1 mixed durum; this is a grade of wheat that is not of milling quality, and is known to the trade as "exportable durum." Minneapolis is the recognized market for milling durum, whereas Duluth is the recognized market for the poorer grades of durum which are used for export purposes, such as the grain covered by the warehouse receipts in this case. In shipping this kind of grain from points from which it must pass through Minneapolis on its way to Duluth, the railroad companies give the privilege of trying the market at Minneapolis. At Minneapolis there is a limited quantity of the "exportable durum" purchased for manufacture of low grade flours and for feed purposes. At Minneapolis also there are buyers of this kind of wheat who buy it at Minneapolis but for delivery at Duluth; these buyers buy the wheat at Minneapolis on the basis of delivery at Duluth, and the wheat is unloaded at Duluth. If a satisfactory bid is not received for the car of this wheat offered at Minneapolis, it is continued on its way to Duluth, where it is sold to the best possible advantage upon arrival, without any additional freight charge because of the stop-over in Minneapolis. There are no stocks of this so-called "exportable durum" accumulated in Minneapolis, but stocks of this grain are accumulated in the warehouses in Duluth. It is not disputed but that from January 18, 1929, the date that the demand was made, and until April 17, 1929, the date this action was started, an amount of this kind

of grain equal in amount to that covered by the storage tickets could have been bought on the "spot market" car by car at Minneapolis. By "spot market" is meant the actual offerings of grain car by car at the Minneapolis Chamber of Commerce.

■■ Applying these facts to what has already been stated herein, we conclude that Minneapolis is not a terminal market within the meaning of our warehouse law for this kind and quality of wheat known as "exportable durum." True, two cars of the kind of wheat covered by these receipts, out of a total of twenty-seven cars shipped by the defendant, were actually sold and unloaded at Minneapolis, but this fact would not establish that Minneapolis is a terminal market for this kind of wheat, any more than the sale and unloading of these two cars at Pierre would establish that Pierre was a terminal market. Something more than a mere sale and unloading is necessary.

■■ There are different views regarding the meaning and purport of our warehouse laws. One view is that these statutes authorize a sale by the warehouseman of the grain deposited under the provisions of this law, and that the only obligation of the warehouseman is to deliver the same amount, kind, and quality upon demand. If this interpretation of the law is correct, it is not reasonable to assume that the law contemplates that the warehouseman after demand be compelled to go upon the "spot market" and pick up this grain car by car, when there is a recognized market for this particular kind of grain to which he may go and get this grain, and make delivery thereof. Another view of this law is that there is no authority in the warehouseman to sell the grain deposited under this law, but that he must keep grain in an amount, grade, and quality on hand at all times, sufficient to redeem all outstanding storage tickets. Under this interpretation of the law, should we hold, under the facts here presented, that Minneapolis is a terminal market, we would require the warehouseman to rent a bin in Minneapolis where no stocks of this grain accumulate, and store the grain; either this or send the grain to Duluth in the ordinary course of trade and get his warehouse receipt, and, when a demand is made for delivery at Minneapolis, go upon the floor of the Exchange and "pick up" this grain car by car.

■ It is our opinion that the term "terminal market" as used in this warehouse law refers to that market where stocks of

the particular kind of grain accumulate in the natural course of the grain trade, and is not determined by the fact that a grain exchange is located at some particular point where it is possible to go upon this exchange and purchase the particular kind of grain in carload lots in an amount depending upon how many carloads happen to be available at that place on the day the grain is wanted. The fact that a grain exchange is maintained at a certain point does not establish the fact that that point is a terminal market. Terminal markets were known before grain exchanges were established. In a government report of the Federal Trade Commission on Co-operative Marketing, being Senate Document 95, Seventieth Congress, First Session, on page 61 thereof, there is the following: "With the development of the great grain producing areas, terminal markets in which this grain was sold also developed. As buying and selling at these points became more complex, due to the millions of bushels of grain flowing into these markets, and the advent of various groups of middle men into the marketing field, there developed what are known as grain exchanges. These exchanges are places where members can meet to buy and sell with maximum facilities for gathering information regarding market conditions and prices."

This holding, that Minneapolis is not a terminal market under the facts here presented, for the particular kind of grain in question, within the meaning of section 9753, makes unnecessary any consideration of the failure of the plaintiff to tender freight charges, in addition to the tender of the charges covering the storage.

The case was tried upon the theory that a conversion of the grain took place on January 18, 1929, when there was a failure on the part of the defendant to deliver upon demand, tender, and offer by the plaintiff. The complaint alleged a conversion at this time. The evidence disclosed, and the court so found, that prior to January 18 the defendant had shipped and sold all grain of the kind and quality covered by the warehouse receipts, and that on January 18 had on hand no grain of this kind.

After considering the "Findings of Fact" and decision of the trial court, we are of the opinion that the court bases its finding of conversion upon the fact of the sale of the stored grain. The defendant assigns this as error on the ground that the court's

findings of fact must be responsive to the issues raised by the pleadings and litigated by the parties. However, under the view which we take of the rights of the warehouseman to dispose of the grain deposited with him under this law, the reasons for the trial court's decision become immaterial.

The question for our consideration is, Does the fact that the warehouseman has disposed of the grain, and has no actual grain on hand to redeem outstanding receipts, constitute a conversion of the grain, provided the warehouseman offers to redeliver grain of like kind, grade, and quality at the terminal market upon proper demand, tender, and offer, and is able to do so by an immediate purchase of the grain at the terminal market. The record in this case is that the defendant offered to deliver the grain at Duluth, and had made arrangements there for its delivery when demanded by the plaintiff.

This court in the case of South Dakota Wheat Growers' Ass'n v. Brady, 51 S. D. 180, 212 N. W. 922, 924, defined the obligations of the warehouseman under a storage receipt issued under the provisions of our statutes, which, with one exception not here material, were the same as the statutes under which the receipts in this case were issued. The receipts themselves are, in all respects here material, the same as those in the Brady Case. In that case this court said:

"While several questions are presented and argued in the briefs, we find no necessity of considering any question, except that of what Brady [the defendant] was required to do to relieve him from liability under the storage tickets issued by him. * * * If Brady's offer of delivery was sufficient to comply with his contract, the refusal of the offer waived delivery, and there was no conversion.

"Brady's contract with the holders of the storage tickets is found in the tickets themselves, taken in connection with the statutes which were in force at the date of the tickets. The tickets provide that Brady will deliver to the holder wheat of the same amount 'and same quality by grade'; and they further provide that, if conditions arise to prevent delivery at the elevator where the grain is received, the warehouseman reserves the right to make delivery at the terminal market, upon payment of storage charges and freight charges."

It is interesting to note, in passing, that the plaintiff in this Brady Case was the same as the plaintiff in this case and represented by the same attorneys. A study of the briefs in the Brady Case also discloses the fact that Brady had sold the wheat covered by the tickets and to make redelivery bought storage tickets on the Duluth market, and delivered the grain by a delivery of the Duluth storage tickets.

The effect of the decision in the Brady Case, supra, is that the obligation of the warehouseman under the statute and contract is to make delivery of grain of the same amount, and, as the statute then provided, "same quality by grade," either at the elevator or terminal market, and, if the warehouseman offers to fulfill this obligation, there is no conversion. That the obligation of the warehouseman is such as defined in the Brady Case is apparent from a reading of the statute. Section 9754, Rev. Code 1919, as amended by Laws 1925, c. 299, § 7, provides: "Upon the return of any storage receipt by the holder thereof to the public warehouse issuing same, and the tender of all proper charges on the grain represented thereby, such grain or an equal quantity of the same grade, kind and quality shall be immediately delivered to the holder of such receipt as rapidly as due diligence, care and prudence will justify. Provided that nothing in this section shall be construed to mean the delivery of the identical grain specified in the receipt, but an equal amount of the same grade, kind and quality and if the grain so delivered, has not been cleaned by the warehouseman, there shall be added to the amount so delivered the amount originally deducted from the grain stored, for dirt, which amount shall also be delivered, and when such grain is to be delivered from some terminal market point, the public warehouseman issuing such storage receipts shall guarantee both weight, grade and quality. Provided further that the deposit of such receipts together with all storage charges upon the grain represented thereby, with any bank located in the city or town where such elevator is located, or any other bank agreed upon by the parties, shall, after notice to such warehouseman, constitute and be deemed a sufficient compliance with this section relating to return of storage receipts and tender of storage charges."

The warehouse receipts issued by the defendants were in compliance with section 9753, Rev. Code 1919, and as follows:

"Farmers Grain Co. of Firesteel

"No. ———:

"Firesteel, S. D. ———, 192—.

"Received in store of ——— ——— Bushels No. ———
Grade ——— Kind of Grain ——— which amount and same kind
and grade will be delivered to the owner of this receipt, or his
order, as provided by law and the rules of the Board of Railroad
Commissioners of South Dawota, upon surrender hereof and pay-
ment of lawful charges.

"First—Including all charges for receiving, handling, issuing
and delivering of flaxseed, four cents per bushel; of wheat, three
and one-half cents per bushel, and of corn, oats, barley and other
coarse grain, three cents per bushel.

"Second—Storage from date of receipt, one-thirtieth of one
cent per bushel for each day thereafter.

"Third—Unless otherwise agreed in writing the storage period
on corn shall terminate on April 1st following the issuance of the
receipt.

"Fourth—Where grain is delivered to the holder of receipts
such grain shall be delivered subject to weights and grades at
terminal.

"Fifth—If delivery is demanded, it will be made at this ware-
house if possible. If conditions arise that prevent such delivery,
we reserve the right to make delivery at a terminal market where
we ship grain, said terminal market to be designated by the holder
hereof, upon the payment of legally established storage charges
and the regular freight charges between this station and the ter-
minal market selected, on the gross amount called for by this
receipt and subject to the requirements of the statutes in relation
thereto.

"Sixth—If grain is cleaned at owner's request, one-half cent
extra per bushel.

"Seventh—This grain is insured for the benefit of the owner,
against loss by fire or tornado.

"——— Bu. ——— lbs. Gross

"——— Bu. ——— lbs. Dockage

"——— Bu. ——— lbs. Net

"Farmers' Grain Co. of Firesteel,

"By A. L. Holt."

There certainly is no express provision in either section 9753 or section 9754, or the receipt, prohibiting a disposal of the grain by the elevator.

It has been suggested that the provision allowing "storage" to be charged from the date of the receipt until demand is opposed to the idea of a disposal of the grain by the warehouseman; but in this connection it can be well said that, so far as the man who deposits his grain under the provisions of this law is concerned, the result to him is the same whether the grain is sold or not, provided the warehouseman is able to deliver the same amount of the same grade, kind, and quality upon demand. If the elevator man is not able to fulfill his obligation, the depositor of grain is protected by the bond provided for in section 9751. In construing the provisions of this law, Judge Elliott in the case of Nicholson v. H. Poehler Co. (D. C.) 284 F. 992, 993, said: "I am convinced that the purpose of the provision of the statute requiring a bond is a recognition of the necessity for the transfer of the wheat to a terminal market and the sale by the person storing it. * * * The mere fact of the sale of the wheat, or transfer of the wheat to the terminal market, is nowhere suggested a violation of the rights or duties of the warehouseman. It seems clear to me that the provisions of this law were enacted for the very purpose of permitting the warehouseman to take the grain, sell it, and carry it at a reasonable price for the producer, giving him the benefit of storage, knowing that, under the conditions that exist in this country, there is absolute impossibility of carrying the actual grain in the warehouse; that there are no warehouse facilities anywhere in this country to hold and carry the grain of the producers; that the warehouse facilities as I have stated above, are only sufficient for the ordinary marketing of the grain as it comes in, and not sufficient for that if anything out of the ordinary occurs to burden or hinder transportation."

It can be further well said that the rates paid for storage are so small as to conclude any depositor of grain from believing that his grain will actually be kept in storage in the bin. The rate provided in the receipt is one-thirtieth of 1 cent per bushel per day, or 1 cent per bushel per month. On this basis an elevator with a storage capacity of 5,000 bushels would receive $50 per month for the use of the elevator in storing grain. The elevator

in addition would be required to pay a premium on a bond large enough to cover the value of the grain of all outstanding storage receipts, and, as provided in the receipt prescribed by the Board of Railroad Commissioners, pay the premium on insurance on 5,000 bushels of grain against fire and tornado.

Section 9758, Rev. Code 1919, is relied upon principally by the respondent to support the contention that there is no authority in the warehouseman to dispose of the grain. This section is as follows: "Whenever any grain shall be delivered to any person doing a grain warehouse or grain elevator business in this state, and receipt issued therefor providing for a delivery of a like kind, amount and grade to the holder thereof in return, such delivery shall be a bailment and not a sale of the grain so delivered; and in no case shall the grain so stored be liable to seizure upon process of any court in any action against such bailee, except an action by the owner or holder of such warehouse receipt to enforce the terms of the same; but such grain shall at any and all times, in the event of the failure or insolvency of such bailee, be first applied exclusively to the redemption of outstanding warehouse receipts for grain so stored with such bailee. And in such event grain on hand in any particular elevator or warehouse shall first be applied to the redemption and satisfaction of receipts issued from such warehouse."

The transaction is referred to as a bailment. It is not contended, however, that the term "bailment" as used in the statute refers to a transaction which has the elements of the ordinary transaction known as a bailment. This statutory transaction referred to as a bailment, is shorn of many of the ordinary requirements of a bailment. First, the statute contemplates a commingling of the grain, and does not require a redelivery of the identical grain but only grain of the same kind, grade, and quality. Second, a shipment to a terminal market is authorized, and a redelivery is not required at the place the original transaction took place. Third, an immediate redelivery is not required, but only a redelivery as "rapidly as due diligence, care and prudence will justify." Fourth, the obligation of the warehouseman is only to redeliver "such grain or an equal quantity of the same grade, kind and quality."

We have here, then, a relationship created by statute and termed a "bailment." The statute itself precludes any thought

that the relationship created is the ordinary relationship of bailor and bailee. The relationship must be construed and determined from the provisions of the statute itself.

Much reliance is placed upon the late North Dakota case of State v. Farmers' Elevator Co., 59 N. D. 679, 231 N. W. 725, 727, wherein the North Dakota Court said: "When the plaintiff stored his grain, the title thereto remained in him. The elevator company was a bailee, but had the right to ship out and sell the grain thus stored, providing it substituted therefor other grain of like kind and quality. If it shipped out so much of the grain in its possession that not enough remained to satisfy the plaintiff's tickets, then to the extent of the resulting deficiency there was a conversion. But, if subsequently and before a demand for the grain was made, the elevator company procured other grain of the same kind and quality sufficient to satisy the plaintiff's tickets, then such grain became the plaintiff's grain, and he was entitled to the same on demand. If such later acquired grain was also shipped and sold so that again not enough remained to satisfy the plaintiff's tickets, then there was another conversion. * * * But, if the company later bought grain of the same kind and quality, in the meantime there having been no demand for the grain, the default was cured, and plaintiff could not thereafter claim a conversion as of the October date."

■■ This statement and holding of the North Dakota court was made in a case where the elevator company was insolvent, and unable to redeliver upon demand. As we construe this North Dakota decision, there is a conversion if stored grain is sold down below a point where the mass is reduced until there is not sufficient to redeem outstanding storage tickets, but, if other grain is added to the mass prior to the time of demand, and brings the mass above that point sufficient to redeem outstanding tickets, the conversion is cured. We believe that it would be as logical to hold, and more in conformity with the intent of the statute, that the conversion, if any, is cured by a repurchase at the time of demand, rather than by a repurchase after the sale but before demand. However, under our construction of this warehouse law and the construction placed upon these statutes in the case of South Dakota Wheat Growers' Ass'n v. Brady, supra, it is the failure of the warehouseman to comply with his statutory obligation that constitutes the wrong.

There is no wrong or conversion until there is a failure or refusal to deliver an equal amount of grain of like kind, grade, and quality upon demand, tender, and offer as provided by law.

The statute only requires redelivery of the grain to be made "as rapidly as due diligence, care and prudence will justify." It is our opinion that this provision of our statute recognizes the right of substitution, and that the statute is complied with if immediately upon demand the warehouseman, by use of the modern means of communication, purchases at the terminal market the same amount of grain of like kind, grade, and quality and offers to deliver this grain at the terminal market to the ticket holder.

Just what title is passed when an elevator disposes of grain deposited with it under the provisions of the warehouse law is not necessary for us to now decide. Nor is it necessary for us to decide the liability of the purchaser from a warehouseman in the event of insolvency of the warehouseman and his failure or inability to deliver the grain of like kind, grade, and quality upon demand.

The judgment and order appealed from are reversed.

POLLEY, P. J., and CAMPBELL and WARREN, JJ., concur.

MISER, C. (sitting in lieu of ROBERTS, J., disqualified), concurs.