## DILLEY v. GRUVER et al.

### No. 4648.

Court of Civil Appeals of Texas. Amarillo.

Oct. 5, 1936.

Rehearing Denied Nov. 16, 1936.

Hoover, Hoover & Cussen, of Canadian, for appellant.

Sanders & Scott, of Amarillo, for appellees.

MARTIN, Justice.

On the dates mentioned herein, J. H. and L. H. Gruver were duly qualified and acting public warehousemen under the Texas statute. As such they issued to appellant the following instrument:

"Warehouse Receipt

"Gruver, Texas, Sept. 12, 1932 No. 42
 "J. H. Gruver & Son Elevator.
"Received for storage from D. C. Dilley.
 "Address: Borger, Texas,
"5,000 Bushels of Wheat, in Gruver Elev a Gruver, Texas,
"Subject to his order hereon, on payment of all charges and surrender of this receipt properly endorsed.
 "J. H. Gruver & Son Elevator.
"By Guy Reed."

The subject matter of this suit is the wheat stored by appellant with the Gruvers under such contract, admittedly for the purpose of enabling appellant to sell same later on the market.

On February 2, 1935, appellant filed the petition upon which he went to trial, alleging a willful conversion of said wheat. He asked $1 per bushel, the highest market value of said wheat from the date of its alleged conversion to the time of the trial, less a credit of $2,000 paid to him by the Gruvers during 1933. Judgment herein was for appellees, and appears to have been the result of a trial in March, 1935, though not entered until November, 1935.

Trial was to the court. Its judgment recites: "The court finds that there was not a sufficient tender of the warehouse receipt nor a sufficient demand for the wheat to warrant a judgment for the plaintiffs."

Lengthy findings of fact and conclusions of law appear in the transcript, some of which are:

"Plaintiff never at any time returned his warehouse receipt to defendants for cancellation or surrender, and the same was still outstanding at the close of the trial.

"Plaintiff at the time of filing this suit demanded of defendants that they settle with plaintiff on the basis of $1.00 per bushel, as for conversion, the highest market price since the warehouse receipt was issued.

"Defendants refused to settle except on the return of the receipt, the payment of storage, on market value basis, market value thereof less the storage charges. * * *

"At the time the $2,000.00 was paid on the wheat account there was then a balance due of $624.00, calculating on the basis of the then market value of plaintiff's wheat and deducting the then due storage charges. Thereafter the market price of wheat declined to a price level where the plaintiff had no margin in his wheat, that is, to a price level where the $2,000.00 already paid was more than enough to cover the total market value of plaintiff's wheat stored. * * *

"Conclusions of Law.

"The loss by defendants of the wheat stored in terminal elevators, including plaintiff's wheat, was not a conversion.

"Defendants could be placed in default so as to have a cause of action as for conversion, only by the delivery and surrender of the warehouseman receipt to defendants for cancellation and reasonable demand for redelivery of a like quantity and grade of wheat.

"The measure of damages for the conversion of the wheat, if the loss of the wheat in the terminal elevators constituted a conversion, was the market value of the wheat as of the date of conversion, to-wit, 18¢ per bushel."

The evidence is abundantly sufficient to make issuable such of the facts and conclusions found by the court in support of its judgment, which we hereafter discuss.

We quote briefly from the statement of facts:

"Q. Has Mr. Dilley ever presented that warehouse receipt to you and asked for his wheat or asked for its equivalent in money? A. No, sir. * * *

"Q. Could you and would you at any time have settled with Mr. Dilley by furnishing him wheat of the same grade and

quality or its equivalent, the market price at any time he would have presented that warehouse receipt and asked for it? * * * A. There never was a time from the time Dilley put his wheat in there that he couldn't have got the wheat or its equivalent.

"The Court: Up to when?"

"The Witness: Up to now, today.

"Q. Up to today? A. Yes, sir, by paying the charges, the accrued charges and the loan.

"Q. You mean to say that if he wants his wheat today on this warehouse receipt and presents the warehouse receipt that you will settle with him just like you would any other time during the whole entire transaction? A. Yes, sir, I would have to under the warehouse law."

It further appears that the above warehouse receipt had been hypothecated by appellant to a bank as collateral and was in said bank's possession at least as late as June, 1933. The financial ability of appellees to pay in cash the full market value of said wheat upon demand has not been questioned, and is not here an issue. The record sufficiently supports the conclusion that they likewise could have delivered wheat of the same quantity and of like quality except for a very short period in November, 1932, perhaps for not over a day or two.

The command of the statute is: "No public warehouseman who shall issue a receipt for goods shall, under any circumstances or upon any order or guarantee whatsoever, deliver the property for which receipts have been issued, until the said receipt shall have been surrendered and canceled except in case of lost receipts. In default of strict compliance with the provisions of this article, he shall be held liable to the legal holder of the receipt for the full value of the property therein described, as it appeared on the day of the default." Article 5574, R. S. 1925.

The following quotations from authorities support the view of the trial court:

"A warehouseman discharges his duty to depositors of grain when he delivers to them grain of like amount, kind, grade, and quality without regard to where he procured it. Demand for the grain or its value throws upon the warehouseman the burden of offering substituted grain if he would not or cannot deliver the identical grain stored and such substituted grain should be of the same kind and quality as that originally stored. The warehouseman satisfied his obligation by delivery of grain of the kind, amount and quality specified by the storage tickets, and may have the option of returning the grain or paying the market value at the time of demand." 67 C.J. 523.

"Plaintiffs' (warehouse) receipt was held by the Citizens' National Bank of Davenport as collateral to a loan. * * * It was not within Sexton & Abbott's power to give * * * good title while the bank held the receipt." Sexton & Abbott v. Graham, 53 Iowa, 181, 4 N.W. 1090, 1100.

"Our statute contemplates a delivery of the grain, not the identical grain, but only grain of the same amount, kind, and quality. * * * One view is that the statutes authorize a sale by the warehouseman of the grain deposited * * * and that the only obligation of the warehouseman is to deliver the same amount, kind, and quality upon demand. * * * Under our construction of this warehouse law * * * it is the failure of the warehouseman to comply with his statutory obligation that constitutes the wrong. There is no wrong or conversion until there is a failure or refusal to deliver an equal amount of grain of like kind, grade, and quality upon demand." South Dakota Wheat Growers Ass'n v. Farmers' Grain Co., 58 S.D. 480, 237 N.W. 723, 725.

"Before there can be a conversion, it must be made to appear that the warehouseman has put himself in a position where he cannot or will not comply with a lawful and proper demand for delivery. * * * We do not understand that there was or could have been any conversion in law prior to the demand. The mere emptying of the bin or of the warehouse, while important on the question of the destruction of respondent's wheat by fire, does not establish conversion without the added showing of demand and refusal. Even though appellant had swept all of its bins clean, under the statute * * * it was entitled to procure, if it could, and deliver within 48 hours after the demand, wheat in the amount, kind, and grade deposited. Therefore, while there might have been conversion in fact, there could have been nothing which the law would regard as a conversion at the time of the fire." Stevens v. Wilson Creek

Union Grain & Trading Co., 145 Wash. 624, 261 P. 399, 402.

 It would unduly lengthen this opinion to state and discuss the multitude of contentions found in the briefs on file. The following is a brief statement of the background of this lawsuit: In 1932 an unprecedented situation existed in the markets of the world. It amounted in effect to a financial catastrophe. In order to assist its farmer customers, there had been stored by the Gruvers in a terminal elevator at Amarillo a large amount of wheat, including apparently that of appellant. It conclusively appears that it was contemplated that such wheat would be mixed with other wheat in storage and its identity thus lost. Money was borrowed on this mass of wheat and advanced to farmers having wheat stored. Appellant did not then borrow any. About November, 1932, the market declined to 18 cents, and this entire mass of wheat was taken by creditors to repay the money so advanced. The substance and effect of appellant's controlling contention here is that such facts constituted a willful conversion, and that appellant was entitled to the highest intermediate value of his wheat to the date of the trial, without the necessity of demand or tender of warehouse receipt. This upon the hypothesis that appellees, the Gruvers, had placed it out of their power to redeliver him his wheat, thus dispensing with the necessity of demand and tender.

This contention is answered by the statute and authorities already quoted.

Furthermore, after November, 1932, and apparently with full knowledge of all the facts, appellant treated the storage contract as still in full force and effect. About June, 1933, he received $2,000 on said wheat, executing a contract which reads in part:

"Whereas, on or about and during the month of June and July, 1932, one D. C. Dilly of Hutchinson County, Texas, stored with J. H. Gruver and L. H. Gruver at their elevator at Gruver, Texas, a total of 4,975 bushels of wheat to be paid for when sold according to the terms and conditions understood and agreed upon by and between the parties, and

"Whereas said wheat has not been sold and that the said J. H. Gruver and L. H. Gruver are still obligated to the said D. C. Dilly by reason of the aforesaid storage agreement, and still owe the said D. C. Dilly for said wheat."

Thereafter the market declined to a point where appellant's remaining equity in said wheat was entirely absorbed, as found by the court, quoted above.

The trial court apparently gave to the above transaction the effect of a full payment to appellant in settlement of all amounts due him under said contract. We need not decide this question and mention it only as conclusive evidence that, long after the alleged conversion, appellant himself recognized that the contract had not been breached and was still in full force and effect.

 The market reached $1 per bushel after the above, but appellant neither asked that his wheat be sold or demanded its return. It appears here such demand would and could have been complied with. Instead, appellant waited until February, 1935, to act. He peremptorily demanded the $1 per bushel. We think the evidence fails to show a willful conversion, but do not pause to recite the facts. Conceding that such conversion was willful, the facts of this record affirmatively show that appellant is not entitled to an application of the harsh rule of highest intermediate value from the conversion to the date of trial. Appellant assumes apparently that the law is well settled in his favor, and cites Burmarsal Co., Inc., v. Lake (Tex. Civ.App.) 272 S.W. 582, and Early-Foster Co. v. Mid-Tex Oil Mills (Tex.Civ.App.) 208 S.W. 224. The question is one of the most vexing and unsettled with which modern courts deal. The question, including an analysis of both the above cases, was recently passed on by this court in Security State Bank v. Spinnler, 78 S.W. (2d) 275 (writ ref.). This is the latest expression on the subject of which we are aware. The authorities are there collated and discussed. Following the rule there announced, we hold here that appellant's cause, if any he had, for a willful conversion, was not diligently prosecuted. He waited over two years before he made claim for highest market value, and no excuse is shown for such delay. Moreover, the language of article 5574, supra, is: "He shall be held liable * * * for the full value of the property * * * as it appeared on the *day of the default.*" (Italics ours.)

We hold in brief: (1) There was no default proven; (2) that, in any event,

appellant was not entitled to the highest intermediate value of said wheat and, having sued for this only, the court correctly entered judgment against him.

The appellant in this case by his pleading and proof gave the trial court no chance to enter judgment for any amount, save the highest intermediate value of the wheat from the date of the alleged conversion until the trial. His production of the warehouse receipt at the trial therefore availed him nothing. While treating the contract in full force' and effect for the purpose of collecting money on same, he asked the court to treat it as being in default to enable him to collect the highest intermediate value on his wheat.

Some of the above facts are conclusive and some disputed, but, where disputed, were sufficient to raise an issue in support of the trial court's judgment, and are therefore stated as facts without a tedious repetition of all the evidence.

Judgment affirmed.