**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED MARKETING ASSOCIATION, a partnership, H. W. Helgevold, and Izola M. Boyd, Executrix of the Estate of G. C. Boyd, Deceased, Defendants.**

Civ. No. 594.

United States District Court
N. D. Iowa,
Central Division.

Aug. 5, 1963.

Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, for plaintiff.

Alan Loth, Fort Dodge, Iowa, Lyman Lundy, Eldora, Iowa, for defendants.

HANSON, District Judge.

The action here is one for conversion of grain. The plaintiff contends that the defendants purchased from a warehouseman converted corn. The Complaint in substance states that from January 1, 1950 to September 30, 1952, defendants converted 151,514.35 bushels of plaintiff's corn by purchasing it from Burt Grain Company which held it in storage. The answer of the defendants as amended denies this and claims protection under Title 15, United States Code, Section 714p.

After the institution of the action and long prior to this submission and on July 25, 1960, the District Court in and for the Northern District of the State of Iowa entered a summary judgment for the defendants, and under the rulings in United States v. United Marketing Association, et al., 8 Cir., 291 F.2d 851, a portion of which reads as follows, to-wit:

> "On this appeal the government does not take issue with the granting of summary judgment with respect to shipments made prior to September 4, 1952, the date on which report of the injunction proceedings against the Burt Grain Company was published in the Fort Dodge Messenger

and read by Helgevold. Accordingly, no consideration is given herein to the government's claim as originally made insofar as it referred to shipments prior to September 4, 1952,"

it now appears that the judgment involving the last 12 cars of corn purchased on and after September 4, 1952, has been set aside pursuant to the Mandate of the Court of Appeals and that judgment as to all prior purchases remains intact and undisturbed. This position is further sustained pursuant to a Pretrial Order made and entered by this Court on October 25, 1962, same being acquiesced in by all parties to the action.

The entire case is thus limited to a controversy as it pertains to 12 carloads of corn shipped and purchased by the defendants in this cause of action.

The issues of the case are simple and clear. One issue involves the plaintiff's proof of ownership of the converted corn. The second issue is whether or not the defendants are purchasers within and as defined by the statute indicated as Title 15, United States Code, Section 714p.

## FINDINGS OF FACT

1. United Marketing Association, the defendant herein, is a partnership composed of G. C. Boyd, now deceased, and Howard Helgevold. It appears that the partners conducted the transactions involved in this controversy. The business of the defendants was located at Fort Dodge, Iowa, and consisted of buying grain in carload lots from country elevators and reselling these purchases in the terminal markets. The regular and usual course of the transactions here involved was as follows:

The elevator would load its corn on railroad cars and obtain bills of lading from the carrier. It then offered the car to the defendants. A price per bushel would be agreed upon. The elevator would draw a draft on defendants for its estimate of such price and present it, with the bill of lading, to the defendants. The defendants would pay the draft and

take the bill of lading. The car would then move to defendant's customer at the market. Its weights and grades were determined there and the final price computed accordingly. So the drafts were always either more or less than the actual price. Defendant kept an account with the elevator, debiting it with each draft paid, and later crediting it with the ultimate price of each car, as the proceeds were received. This interval would be several weeks; sometimes months. Balances computed from this account would overstate the elevator's debt to defendant since it would not include credit for corn or proceeds in transit. Defendant's purchases were usually by telephone. This was the usual customary method of handling such transactions by the defendant, and others in this business, and the country elevators with which they dealt. All purchases involved here were made in this same way.

2. Burt Grain Company of Clarion, Iowa, was a partnership of Clyde L. Burt and his father. It operated an elevator there, with which defendant did business as above described. It merchandised grain with others than defendant, in similar fashion. It also operated licensed grain storage facilities, until its license was revoked April 2, 1952. That revocation was not intended to, and did not, forbid its buying corn from farmers, and selling it, as before. It did continue such merchandising without interruption.

3. At least since 1948 plaintiff had stored its corn in Burt's warehouses, under various storage agreements, the last of which was made in 1950 (Exhibit 55). This mentions another warehouse at Galt, Iowa; but there is no evidence that any of the disputed 12 cars originated there. It provided that Burt should receive, store, insure and condition plaintiff's corn; and ultimately load it out; issue warehouse receipts representing the corn as received; store it "in the warehouse"; and "at all times maintain in the warehouse a stock of grain of the class, grade and quality" described in the receipts, equal to the quantity they called for. It allowed Burt to commingle plaintiff's corn with that of others, and also with his own.

4. Burt issued warehouse receipts to plaintiff which are in evidence. Each called for a specific quantity of No. 2 corn. The last receipt is dated October 15, 1951.

5. Before its license was revoked, Burt had disposed of substantially 151,000 bushels of plaintiff's corn, for which plaintiff has not been reimbursed. During the summer and fall of 1952, Burt never had enough corn in its warehouses to equal the amount called for by plaintiff's receipts. This defalcation was apparently the reason for revoking the licenses. Clyde Burt was also indicted for it.

6. In January and February of 1952, plaintiff surrendered its warehouse receipts to Burt and demanded the corn they called for. Its shipment to plaintiff began. The evidence discloses that all of the plaintiff's corn actually in the warehouse facilities had been shipped prior to September 4, 1952. However, there is some proof that some small amount of corn was subsequently discovered in some facility which was later taken by the Government on or about September 17, 1952. In any event, the proof indicates that practically all of the corn available under the storage agreements and warehouse receipts was gone before September 4, 1952.

7. The evidence does establish that the elevator at Clarion through which grain was merchandised was separate from the tanks and bins which comprised the storage or warehouse facilities. It further appears that they were served by movable spouts so that grain to be stored was put in the storage bins and grain to be merchandised was run through other portions of the elevators into cars. The evidence does not establish that corn moving into the elevator after September 4, 1952, ever went into the warehouse tanks or bins or was actually commingled with the plaintiff's corn. This is also substantiated by the lack of corn of any nature or kind of the

plaintiff with which to commingle the grain being delivered. The evidence establishes that Burt did owe the plaintiff much corn at this time but there is no proof which could sustain the position that he had replaced plaintiff's corn with the corn now claimed by plaintiff. On the contrary, the evidence clearly shows that the corn which was being merchandised by Burt through the elevator was not intended for storage or warehousing, and neither was it stored or warehoused. In fact, the evidence discloses that the plaintiff's representatives were even present and knew how the grain was coming in and how it was going out.

8. Before and after September 4, 1952, Burt was a dealer regularly engaged in buying and selling corn and other fungible grains. For some years before that date, defendant had purchased corn and grain from Burt, physically sold and delivered in the ordinary course of business, in good faith, for full value paid. Defendant did not know or have reason to know of any defect in Burt's authority to sell the corn it bought. These transactions all followed the pattern described above. Plaintiff emphasizes that in March 1952 Burt's drafts had been twice the value of his shipments, resulting in his owing defendant a large overdraft. Plaintiff claims that defendant's further dealings with Burt were motivated by bad faith, or a desire to collect this debt. There is evidence that at one time this overdraft was slightly over $18,000.00. Burt paid the larger portion of this quite promptly, with cash and soy beans. Before September 4, 1952, this debt was reduced to about $4,300.00. The court finds that defendant was not concerned about this debt, nor motivated thereby to deal with Burt otherwise than regularly and in good faith. The judgment heretofore entered means, and the court finds as a fact, that all of defendant's purchases before September 4, 1952, were in good faith as described herein, protected by said Section 714p of Title 15.

9. Plaintiff's claim as now made arises because after the close of business on September 4, 1952, Helgevold read the following article in the Fort Dodge evening Messenger:

"ISSUE INJUNCTION AGAINST GRAIN FIRM AT CLARION, ROLFE

"Waterloo (AP)—The federal district court reported Thursday an injunction has been issued against the Burt Grain Company of Clarion and Rolfe, prohibiting it from selling any of its grain to any purchaser except the Commodity Credit Corporation pending a suit against the firm.

"The government has sued the company, operated by Clyde L. Burt, alleging the firm sold grain which was the property of the corporation. At a hearing the company consented to the injunction."

10. The injunction referred to is part of the decree, Exhibit 73. It provides that Burt and his employees are

"hereby permanently enjoined and restrained from shipping, selling, disposing of, or in any manner converting any of the corn now in their possession and stored in the elevators of (Burt)."

The Court cannot find that any corn contained in the 12 cars in controversy, and especially the last 10 cars loaded out, was stored in Burt's elevator, or even in Burt's possession, on September 3 when this decree was entered. Certainly there is no proof that any of the corn contained in the last 10 cars was either stored or in Burt's possession on September 3. Plaintiff's Exhibit 69, page 40, itself states that these sales were from points elsewhere than Clarion or Galt.

11. Before Helgevold read the above article, defendant had already bought and paid for the first two cars during business hours on September 4. These purchases are clearly proved to have been made in the same manner and with all the factual elements described in findings No. 1 and 8. They contained corn of the actual value and agreed price of $6,062.-20, on which defendant had already paid drafts totalling $5,700.00. Nothing had

occurred to place these cars in any different category than the previous ones, and the plaintiff's case as to them is clearly negatived.

12. After reading the newspaper, Helgevold talked with Boyd. Boyd had no information about Burt. Helgevold had once lived in Wright County; and attorney Lundy had been his family's lawyer there. He telephoned Lundy that evening to ask his advice. Lundy replied that he was also Burt's lawyer, that all the government corn had gone out of the elevator, and there was no reason why defendants could not safely deal with Burt. Next morning Helgevold went to the Burt elevator at Clarion. He saw farmers bringing in and selling corn, and all the ordinary activity of a country elevator. Clyde Burt was not there, but his father assured Helgevold that all government corn had been shipped out, and they were merchandising other corn as usual. Helgevold believed and relied on this information. There was no one else in Wright County or Fort Dodge of whom to inquire further. The inquiry made was reasonable and diligent. The sources of information were apparently trustworthy and correct; and reasonably indicated Burt was free to buy and sell his own corn. Defendants did not in fact have any knowledge or reason to know of any want of authority in Burt to sell the corn thereafter purchased.

13. After the foregoing, defendant bought 10 cars of corn from Burt. The first car was bought when Clyde Burt telephoned to offer it. Helgevold then inquired of him to be sure it was not government corn, and was again assured it was not. He then bought this car, and the later ones, in the same manner as before. These 10 cars may be summarized as follows:

| No. | Date | | | Total Final Price | Draft Paid |
|---|---|---|---|---|---|
| 1. | Sept. | 6 | No. 3 | $2,744.16 | $2,800.00 |
| 2. | " | 9 | No. 1 | 2,877.92 | 2,700.00 |
| 3. | " | 9 | Sample grade; musty | 2,434.68 | 2,800.00 |
| 4. | " | 12 | No. 1 | 3,151.29 | 3,100.00 |
| 5. | " | 15 | No. 2 | 2,681.91 | 2,300.00 |
| 6. | " | 15 | No. 4 | 1,990.79 | 2,300.00 |
| 7. | " | 20 | No. 4 | 2,836.07 | 2,800.00 |
| 8. | " | 20 | Sample grade, musty | 2,264.89 | 2,000.00 |
| 9. | " | 24 | Sample grade | 2,303.08 | 2,400.00 |
| 10. | " | 26 | Sample grade | 2,128.76 | 2,600.00 |

14. During these transactions, defendant continued to permit Burt to estimate his own drafts. It paid more than the final value for five of these ten cars. It did nothing to force payment of any antecedent debt, shave the price, exact unusual profit or otherwise depart from the usual method of doing business in good faith. It paid the full market price, and profited only by the small margin current in the trade. Only cars numbered 2, 4, and 5 graded No. 2 or better. No others would qualify for storage, or meet the grade or quality called for by plaintiff's warehouse receipts.

15. The court finds that defendant has proved that it did pay value for all these cars in good faith; without knowing or having reason to know that Burt lacked authority to sell them; without knowledge or reason to know that plaintiff owned or claimed this corn; that both parties were regularly engaged in their respective business; that each transaction was in the ordinary course thereof, and that Burt was then a dealer

regularly engaged in the business of buying and selling such goods.

16. The evidence in this cause discloses that the field investigator and special agent was examining the books on a day to day basis up until September 17, 1952. The evidence discloses that the plaintiff was entirely familiar with the movement of the corn to defendants in this cause. There is no indication of any action taken on the part of the plaintiff pursuant to the delivery of the car shipments involved in these transactions. The Government positively knew of the continuing of business with the public by the elevator company.

A further finding of fact appears to be unnecessary for the ultimate disposition of this cause and, except as they are referred to in the conclusions herein, none are made.

### CONCLUSIONS OF LAW

██ With relation to the issues involved in this cause, it would appear that no one doubts that the burden of proof insofar as to the issue of ownership or purchase of corn belonging to the plaintiff is involved that the same rests upon the plaintiff in this cause of action. No one doubts that under the provisions of U.S.C., Title 15, 714p, that the burden of proof clearly rests upon the defendant. United States v. United Marketing Association, et al., supra, and the statute itself.

██ The first issue as to whether or not the defendants may have in a secondary manner converted plaintiff's converted corn becomes a difficult problem. There is no question but what under the law the arrangement that the defendants had with the Burt Grain Company was a bailment, leaving them the owners of corn which they stored there. It was not a sale which made Burt the owner. Sexton v. Graham, 53 Iowa 181, 4 N.W. 1090; Hall v. Pillsbury, 43 Minn. 33, 44 N.W. 673, 7 L.R.A. 529; Carson State Bank v. Grant Grain Co., 50 N.D. 558, 197 N.W. 146; 93 C.J.S. Warehousemen and Safe Depositaries § 14, p. 412; and other cases hereafter cited.

██ If Burt did commingle any of his corn with the stored mass, while that mass was less than his warehouse receipts called for, that commingled corn then became the bailor's property. But these holdings require some substitution of the warehouseman's corn for that which he has taken from the bailors. The mere fact that he has stolen corn from their mass does not, of itself, make them own all corn he later acquires everywhere else. Such corn must somehow become part of the stored mass. Plaintiff's theory obviously is that this automatically occurred as to any corn which Burt bought from farmers, even though it never went into the warehouse, was not intended to go there, was not fit to go there, and was purchased for the merchandising business. Most of the authorities are content to hold, if the depositor's transaction with the warehouseman was a bailment and not a sale, they owned what remained in the warehouse. Some only involve attempts of one depositor to identify his grain as against another's; not any claim that the warehouseman owned any of the mass. None of them decide just when there is a substitution which passes title from the warehouseman to the bailors. No authority makes plaintiff's proof sufficient to show that any corn in these cars came from the mass of corn stored in Burt's warehouse facility, or had been commingled with such mass. Unless Burt's ownership, when acquired from farmers, automatically passed to plaintiff when the corn ran through the elevator to be merchandised, plaintiff has not proved it owned this corn. The court believes that the law does not go that far; and that under this record it cannot be held that this corn was effectively substituted for what Burt had stolen, so as to become plaintiff's property.

Furthermore, the rule for which plaintiff contends would apply only up to the time plaintiff demanded its corn, and surrendered its receipts; thus terminating the consent to commingling and fixing its ownership of the corn then on hand. See State ex rel. Hermann v.

Farmers' Elevator Co., 59 N.D. 679, 231 N.W. 725. It would not thereafter become the owner of different corn, at least until Burt put it with plaintiff's corn, intending to restore to plaintiff what he had taken, or comply with its previous demand.

■ Finally, the rule applies only to corn "of like kind and quality" with that called for by plaintiff's receipts. This means it does not make plaintiff the owner of corn grading 3, 4, 5 or "sample," when the warehouse receipts call for grade 2. Hall v. Pillsbury, supra; State ex rel. Hermann v. Farmers' Elevator Co., supra; 93 C.J.S. Warehousemen and Safe Depositaries § 47, p. 472; Huether v. McCaull-Dinsmore Co., 52 N.D. 721, 204 N.W. 614, 619. Only cars numbered 2, 4, and 5 in finding 13 would inure to plaintiff under this rule in any event. South Dakota Wheat Growers Ass'n v. Farmer's Grain Co., 58 S.D. 480, 237 N. W. 723; Union Elevator & Warehouse Co. v. Farmers' Warehouse, 69 Wash. 664, 125 P. 960; Allen V. Smith, Inc. v. Rosalia Producers, Inc., 36 Wash.2d 680, 219 P.2d 986.

Plaintiff in this cause has not carried the burden of proof and established by a greater weight thereof that there was ever any commingling from and after September 4, 1952. Its theory seems to be that there was a substitution. There must be some difference between commingling and substitution. The cases do seem to indicate that if there is a substitution that the obligation of the warehouse receipt may attach. But the evidence does not even establish a substitution. It would appear that the right to substitution ends at the time that the conversion is actually established. Demand was made and the conversion was actually established in this cause long prior to September 4, 1952.

In Keating v. F. H. Peavey & Co., 71 N.D. 517, 3 N.W.2d 104, the court fixed the rights of the parties as of the time the bailment ended. The case of Carson State Bank v. Grant Grain Co., supra, was distinguished. 'In Keating the court

said the bailment ended when fire destroyed the grain. In Carson State Bank v. Grant, the court said the bailment didn't end when the warehouseman wrongfully sold all the grain because of the rule of substitution.

It would seem, however, that once there is a demand and refusal and conversion is established, the bailment would end, the rights of the parties would end and there would no longer be any right or duty to substitute grain. The depositors would, of course, have a claim on subsequent assets received by the warehouseman but this wouldn't be a preferred claim.

In South Dakota Wheat Growers Ass'n v. Farmer's Grain Co., supra, and State ex rel. Hermann v. Farmers' Elevator Co., supra, the court said:

"If it shipped out so much of the grain in its possession that not enough remained to satisfy the plaintiff's tickets, then to the extent of the resulting deficiency there was a conversion. But, *if subsequently and before a demand for the grain was made,* the elevator company procured other grain of the same kind and quality sufficient to satisfy the plaintiff's tickets, then such grain became the plaintiff's grain, and he was entitled to the same on demand. If such later acquired grain was also shipped and sold so that again not enough remained to satisfy the plaintiff's tickets, then there was another conversion."

■■ Under the general law of bailment, "[w]here bailee of personalty does something which may amount to a conversion of the bailed personalty, owner, in electing to treat bailee as a converter, thereby in effect requires a forced sale of personalty to bailee." 8 C.J.S. Bailments § 31, p. 425. Thus it would clearly seem that a conversion terminates the bailment.

The cases the United States relies on are distinguishable because the grain alleged to be substituted was largely of a quality different than that which was

deposited and also because the alleged substitution occurred after the United States had made a demand and terminated the bailment.

In any event, if this purchaser, the defendant herein, has brought himself within the provisions of the statute, as follows, to-wit:

*"Release of innocent purchasers of converted goods.*

A buyer in the ordinary course of business of fungible goods sold and physically delivered by a warehouseman or other dealer who was regularly engaged in the business of buying and selling such goods shall take or be deemed to have taken such goods free of any claim, existing or hereinafter arising, by Commodity Credit Corporation, based on the want of authority in the seller to sell such goods, provided the buyer purchased such goods for value in good faith and did not know or have reason to know of any defect in the seller's authority to sell such goods. To be entitled to relief under this section a buyer must assert as an affirmative defense and establish by a preponderance of the evidence the facts necessary to entitle him to such relief."

then, and in that event, they are absolved from liability.

 U.S.C. Title 15, Section 714p affords defendants a complete defense to the 12 cars in dispute. These transactions merely continued previous business which is now adjudicated to be protected. The only arguable point is whether defendants "had reason to know" of the plaintiff's claim, despite their actual lack of any such knowledge. The other elements required by the statute are clearly proved, and practically conceded. Mere suspicion, or reason to suspect, is not "reason to believe"—still less "reason to know"; Charlesworth v. Hipsh, 8 Cir., 84 F.2d 834; Cusick v. Second National Bank, 115 F.2d 150; Stark v. White, 215 Iowa 899, 245 N.W. 337. The newspaper article could reasonably mean that Burt was only forbidden to sell the government's corn, and was free to deal in outside grain. Had defendants read the injunction itself, they would see it did not cover the corn they did buy; nor forbid Burt to conduct a grain merchandising business. Defendants had no knowledge that plaintiff owned or claimed that corn. Therefore, they had no duty to inquire for unknown facts about such a claim. The facts known to them, in the light of their information obtained about them did not constitute reasonable cause to believe that plaintiff had or made any claim to this corn. In re Gaylord, 2 Cir., 225 F. 234; Price v. Wilcox Oil Co., D.C., 118 F.Supp. 27; 1 Restatement Agency 2nd, 46, 47, 48; 2 Restatement Property 826. Plaintiff relies largely on Norwood v. Parker, 208 Iowa 62, 224 N.W. 831, and Hayne v. Cook, 252 Iowa 1012, 109 N.W. 2d 188. In both those cases, the parties had actual knowledge of the claim they sought to escape. They designedly avoided known and accessible sources of information which would have confirmed that claim. The decisions merely hold that the inquiry there fell short of what ordinary prudence and good faith required, in the light of the circumstances there present and the actual knowledge at hand. They are factual decisions, not applicable to the facts of this case.

There is no serious question as to the applicability of the statute here involved and no serious import that it did not retroact to cover the controversy at hand. The Court concludes, as has been concluded before in the summary judgment by Judge Graven, that the defendants are clearly within the protection of the statute. The plaintiff here suffered and permitted the continuation of business and permitted the Burt Grain Co. to continue to merchandise. It is singularly significant that every conclusion drawn by Judge Graven in his summary judgment has been clearly established by the proffered testimony.

Accordingly, this Court concludes as a matter of law that the plaintiff's cause should be dismissed and, accordingly, a judgment will be entered.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.