WILLIAM J. CAMPBELL, Senior District Judge.
 

 Plaintiffs, Robert Preston, et al., appeal from an order of dismissal entered by the district court at the conclusion of their evidence in a non-jury trial. The plaintiffs had sought to prove that the United States Department of Agriculture (and certain subordinate agencies thereof) had converted grain owned by the plaintiffs and was therefore liable under the Federal Torts Claims Act (FTCA), 28 U.S.C. § 1346(b). After the plaintiffs had presented their evidence the court made certain findings of fact and then granted defendant’s motion to dismiss. The court concluded that the allegedly wrongful government actions were discretionary and thus within the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a). Alternatively, the court found that the conduct of the defendant did not constitute a conversion under Wisconsin law. For the reasons stated below, we reverse.
 

 
 *531
 
 FACTUAL BACKGROUND
 

 The plaintiffs in this case are farmers who had utilized the grain storage facilities operated by Grain Finance Company, Inc. (Grain Finance) and Farmers Grain Exchange, Inc. (FGX) in Evansville, Wisconsin.
 
 [1]
 
 On July 1, 1969, Grain Finance entered into a Uniform Grain Storage Agreement (UGSA) with Commodity Credit Corporation (CCC),
 
 [2]
 
 an agency of the Department of Agriculture, whereby Grain Finance became an authorized depository for CCC-owned grain and grain deposited as collateral for CCC loans.
 
 [3]
 
 The UGSA stated:
 

 “All the grain accepted by the warehouseman for storage shall be considered to be commingled and the responsibility of the warehouseman with respect thereto shall be as if stored commingled ...”
 

 It is undisputed that at all times relevant hereto, CCC’s grain was in fact commingled in storage with that of other depositors. Somewhat simplified, this means that when depositors brought grain to the warehouse to be stored their grain would be mixed with the other grain in storage and they would receive a warehouse receipt for the amount deposited. Upon the subsequent tender of the warehouse receipt(s), the depositor would be entitled to possession of the same amount of the same quality of grain previously deposited.
 

 The UGSA provided,
 
 inter alia,
 
 that the warehouseman would keep detailed records regarding its financial status and the grain in storage and that CCC would be permitted to examine those records and to inventory the grain on hand. These rights granted to CCC by the UGSA were not available to the other depositors in this case. Pursuant to those contract rights, Charles Craig, an examiner for Agricultural Marketing Service (AMS),
 
 [4]
 
 arrived at Grain Finance on November 13,1972 to perform an inspection of the warehouse. Craig found Benjamin Green, President of Grain Finance, to be uncooperative and either unwilling or unable to produce certain types of records required by the UGSA. Despite this problem, Craig computed the inventory on hand and determined that there was a shortage of approximately 71,000 bushels. Additionally, he included with his report a list of price later obligations
 
 [5]
 
 totalling over 259,-000 bushels.
 
 [6]
 
 The district court found that:
 

 
 *532
 
 By no later than sometime on November 20, 1972, Craig concluded that the warehouse operation was in serious difficulty . . . and advised a superior in Kansas City or Indianapolis of the conclusions which he had reached ... Tr. p. 886.
 
 [7]
 

 At 4:30 p.m. on November 20, 1972, the Agricultural Stabilization and Conservation Service (ASCS)
 
 [8]
 
 received a letter from Benjamin Green on behalf of Grain Finance requesting termination of the UGSA and the removal of all CCC grain. The next day Herbert Cast, an official of ASCS, ordered a “whole-house cleanout” of Grain Finance, which consisted of a loading order for 201,948.87 bushels of grain (the entire amount of CCC-owned grain) and a “stop payment order” (a directive that CCC would pay no money for storage charges and other expenses pending settlement of accounts). Additionally, Cast recommended that “no cars [containing grain] be rejected back to shipper.” In one report this suggestion was justified by the possibility that the warehouse might be in financial difficulty and in another report it was based on the possibility that the warehouse was experiencing a grain shortage. Cast testified that the decision not to reject cars back to the shipper went beyond what was required by a whole-house cleanout, Tr. p. 476. On November 22, 1972 a loading order was issued for 91,517.25 bushels representing grain acquired by CCC through the calling of its price support loans.
 
 [9]
 
 The court specifically found that prior to the loading orders Cast “and others who participated” knew the following facts:
 

 (1) Craig had computed a shortage at Grain Finance of 71,000 bushels;
 

 (2) The price later obligations were approximately 259,000 bushels;
 
 [10]
 

 (3) Grain Finance had failed “for quite some time” to maintain records of its daily position; and
 

 (4) Grain Finance had refused to provide Craig with the grain sheets necessary to reconstruct the missing daily positions. Tr. p. 887.
 

 The court noted that while Cast and the other officials knew that Craig had recomputed the shortage to be about 13,000 bushels,
 

 [T]he actions which ASCS took ... were consistent with a finding that there was a serious difficulty at the warehouse and inconsistent with a finding that there was nothing more than an operational .. . shortage of only 12,983 bushels. Tr. p. 888.
 

 Despite the belief on the part of the CCC that Grain Finance was in serious difficulty, no steps were taken to inform the other depositors of the situation. The Shortage Review Committee of the ASCS was not convened (despite the fact that this committee was specifically designed for this type of situation), the Inspector General of the United States Department of Agriculture was not requested to investigate, nor was the Wisconsin Department of Agriculture
 
 *533
 
 told of the situation.
 
 [11]
 
 Additionally, the plaintiffs introduced evidence that farmers whose loans were called by the CCC at this time were not informed of the shortage.
 

 While the contemplated completion date for the loading orders was January 2, 1973, the loadout was not concluded until October of 1974 due to a nationwide shortage of rail cars. The parties stipulated that “at all times when grain was shipped from the warehouse to CCC after December 21,1972, there was a shortage.” Including the price later obligations, the shortage was stipulated as follows:
 

 April 25,1973 517,327.91 bushels
 

 August 8,1973 639,677.55 bushels
 

 August 20,1974 734,023.97 bushels
 

 The communications between the government agencies and between those agencies and Grain Finance are replete with references to the urgency of the loadout. Additionally, on August 9, 1973, Cast sent a letter to Green which stated in part:
 

 We shall expect you to ship the remaining inventory on hand, that you will also ship the corn being received and shelled until CCC’s obligations have been satisfied, and that you will not sell any of the corn being received and shelled in the meantime.
 

 On October 9, 1974, the final shipment of corn to CCC was made. The “whole-house cleanout” had resulted in the shipment of 293,168.27 bushels to CCC which reduced Grain Finance’s obligation to the agency to 297.85 bushels.
 
 [12]
 
 One month later Grain Finance and FGX closed their doors. As of November 11, 1974, the shortage at the warehouse (including price later obligations) was 764,907.54 bushels, with the corn inventory in the warehouse being 16,592.84 bushels. Needless to say, bankruptcy proceedings were soon commenced. The practical result of the loadout was that the CCC’s obligations were satisfied in full while the other depositors were forced to divide the woefully inadequate assets of the bankruptcy estate.
 

 The plaintiffs filed a claim with the United States Department of Agriculture and after it was denied they filed the initial complaint in this cause. That complaint alleged that the United States was liable for the negligence of CCC in failing to ascertain and/or warn the plaintiffs of the financial condition and grain shortages at Grain Finance in November of 1972. Additionally, plaintiffs alleged that CCC had converted to its own use grain deposited by the plaintiffs at the warehouse. The district court dismissed the complaint based on the conclusion that it alleged tortious conduct involving misrepresentation or deceit and thus was within the exception contained in § 2680(b) of the FTCA. That decision was appealed to this Court and was affirmed with the exception of the claim for conversion which was remanded, see
 
 Preston v. United States,
 
 596 F.2d 232 (7th Cir.1979). On remand, the case was presented to the district court on an extensive stipulation of facts and presentation of evidence.
 
 [13]
 
 The plaintiffs’ theory of the case was that the government officials had conspired to withdraw CCC’s grain without attracting public notice and to that end induced Green to write the letter of November 20, 1972 requesting termination of the UGSA. By enlisting Green’s cooperation, the plaintiffs argued, the CCC had obtained constructive possession over the grain in storage. Its subsequent dominion over the grain was therefore unlawfully obtained and constituted a conversion. The district court’s findings of fact are not consistent with this theory.
 
 [14]
 
 However, more impor
 
 *534
 
 tantly, the court determined at the conclusion of plaintiffs’, case that the government conduct as proved was of a discretionary nature and thus liability was precluded under the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).
 
 [15]
 
 Therefore, the trial judge granted the government’s motion to dismiss. Alternatively, the court determined that no conversion was established because:
 

 [T]he United States enjoyed dominion only to the extent of the corn to which it had a lawful claim and that it asserted its dominion only to the extent of the corn to which it had lawful claim. Tr. p. 893.
 

 While we do not adopt the plaintiffs’ theory of conversion and thus need not reach the factual issues raised, we do conclude that the tort has been proven and that the discretionary function exception is inapplicable.
 

 THE
 
 LUTHER
 
 CASE
 

 Prior to addressing the merits of the case we digress to discuss a case, not cited by the parties, which we believe sheds a bright and manifold light on the issues before us. In
 
 United States
 
 v.
 
 Luther,
 
 225 F.2d 499 (10th Cir.1955), the court was faced with various appeals arising out of the bankruptcy of a grain warehouse. One of the appeals arose out of the referee’s partial denial of the claim filed by the Commodity Credit Corporation (the same entity designated “CCC” herein). The referee had charged against CCC’s bankruptcy share the amount of grain it had obtained from the warehouse after September 30, 1951. The factual background of the case bears a striking resemblance to the facts before us:
 

 Early in September, 1951, a Kansas warehouse examiner, having statutory authority so to do, began an examination of the Grain Company’s storage accounts. He found the records of the Grain Company were improperly kept and that there was a shortage of 132,235 bushels of milo in its storage account. About the same time an auditor of Commodity began an examination of the Grain Company’s storage accounts and found it was short in its milo storage account more than 10,713,-060 pounds and that the state examiner had failed to uncover that shortage. Subsequent to September 30, 1951, and after it had full knowledge of such shortages of the Grain Company’s storage accounts, Commodity obtained from the Grain Company on loading orders 9,426,-780 pounds of milo. 225 F.2d at 503.
 

 The court summarized the applicable legal principles (which we will discuss in more detail
 
 infra):
 

 Such milo and wheat were held by the Grain Company .as bailee, and belonged to the holders of warehouse receipts and the storérs of grain who stored on open storage. Such milo and wheat were fungible and became part of the common masses in storage. Each of the owners became tenants in common of their proportionate share of the grain in storage. [Footnote deleted.] 225 F.2d at 504.
 

 The court upheld the referee’s partial denial of CCC’s claim, reasoning as follows:
 

 The evidence clearly established that there was a very large shortage when Commodity issued its shipping orders and received grain out of the common masses in storage after September 30,1951; that it was impossible for the Grain Company to deliver the full amount of the stored grain owned by the several claimants; and that Commodity knew such facts and induced the Grain Company to deliver grain to Commodity, to the detriment of the interests therein of other claimants. Since there was a shortage in the stored
 
 *535
 
 grain and an insufficient amount to satisfy the lawful claims of all the storage claimants at the time grain was delivered to Commodity on such shipping orders, each storage claimant, including Commodity, was entitled to share in the grain on hand in the proportion that the grain stored by it bore to the total amount of grain stored by the storage claimants. In that proportion, each storage claimant, as a tenant in common, owned an undivided interest in the grain on hand at the time Commodity received grain from the common masses on its shipping orders. It follows that when Commodity received, after September 30, 1951, a portion of its undivided interest in the grain on hand, it was only entitled to receive the remainder of its proportionate interest from the grain remaining in the common masses in storage. To hold otherwise would give Commodity a portion of the grain remaining on hand, which belonged in undivided interests to the other storage claimants. The only way that Commodity could be limited to its proportionate interest of the grain on hand in the common masses on September 30, 1951, was to charge its interest with the amount of grain that was delivered to it out of the short common mass on its shipping orders. That is what the referee did. [Footnote deleted.] 225 F.2d at 505-506.
 

 We do not suggest that the
 
 Luther
 
 case is directly on point with the instant case. It involved only equitable remedies and there was no claim for conversion. However, the similarity of the relevant facts and the reasoning of the court bear heavily on the case before us.
 

 CONVERSION
 

 The FTCA, 28 U.S.C. § 1346(b), provides that, subject to the exceptions listed in 28 U.S.C. § 2680, the government will be liable for the wrongful or negligent acts or omissions of its employees which occur within the scope of their employment “if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.” The parties agree that the relevant acts occurred in Wisconsin and thus the law of that state must be utilized in determining whether a conversion occurred. There is no dispute between the parties as to the proper definition of conversion:
 

 [A]ny distinct use of, or dominion wrongfully exerted over another’s personal property, in denial of, or inconsistent with, his rights therein, such as a wrongful taking of another’s chattels, or any wrongful exercise or assumption of authority, personally or by an agent, over another’s goods, depriving him of the possession, permanently or for an indefinite time. Wisconsin Civil Jury Instruction # 2200 (1963), citing
 
 Adams v. Maxcy,
 
 214 Wis. 240, 252 N.W. 598 (1934);
 
 Heuer v. Wiese,
 
 265 Wis. 6, 60 N.W.2d 385 (Wis.1953).
 

 The contested issues with regard to conversion are: (1) whether the defendant took any grain owned by the plaintiffs; (2) whether such taking was wrongful; and (3) whether the legal remedy of conversion is available to the plaintiffs.
 

 In addressing the first issue we must analyze the respective property rights of the parties as created by Wisconsin law. In 1961, Wisconsin adopted (with some minor modifications not relevant here) Article 7 of the Uniform Commercial Code (UCC) designating it Wis.Stats. § 407.101
 
 et seq.
 
 Wis.Stat. § 407.207(2) provides:
 

 (2) Fungible goods so commingled are owned in common by the persons entitled thereto and the warehouseman is severally liable to each owner for that owner’s share. Where because of overissue a mass of fungible goods is insufficient to meet all the receipts which the warehouseman has issued against it, the persons entitled include all holders to whom overissued receipts have been duly negotiated.
 

 Thus it is clear that the depositors are tenants in common as to the commingled goods. A tenancy in common is defined as a relationship (not an estate) in which the tenants each own an undivided interest in the subject matter and each possess or have the present right to possess the subject
 
 *536
 
 matter, 20 Am.Jur.2d
 
 Cotenancy and Joint Ownership
 
 §§ 22-23; 86 C.J.S.
 
 Tenancy in Common
 
 §§ 4-5. Under Wisconsin law the depositors have the right to possession upon presentation of the warehouse receipt(s),
 
 see
 
 Wis.Stat. § 407.403. Thus, in the instant case, the CCC and the plaintiffs were tenants in common with respect to the stored grain and Grain Finance was the bailee.
 

 When there is a shortage of goods in storage, the legal rights of the depositors are affected. As noted in
 
 Luther.
 

 Since there was a shortage ... each storage claimant ... was entitled to share in the grain on hand in the proportion that the grain stored by it bore to the total amount of grain stored by the storage claimants. In that proportion, each storage claimant, as a tenant in common, owned an undivided interest in the grain on hand ... 225 F.2d 505 (quoted
 
 supra),
 
 citing
 
 Central States Corp. v. Luther,
 
 215 F.2d 38, 45 (10th Cir.1954);
 
 Goodman v. Northcutt,
 
 14 Or. 529, 13 P. 485 (1887);
 
 Dole v. Olmstead,
 
 36 Ill. 150, 155-156 (1864).
 

 The same result must obtain under Wisconsin law, see Wis.Stat. § 407.207(2) (quoted
 
 supra);
 
 Anderson on Uniform Commercial Code § 7-207:5; 3A Bender’s Uniform Commercial Code Service § 10.07[2][c]. Therefore, on November 20, 1972 when the severe shortage was discovered, the defendant was only entitled to its
 
 pro rata
 
 portion of the grain in storage, and to the extent it took more than its share, it*1 took property owned by the other depositors including the plaintiffs. It is uncontroverted that defendant obtained virtually 100% of the grain represented by its warehouse receipts, see footnote 12,
 
 supra,
 
 and thus it is clear that it took more than its
 
 pro rata
 
 portion as of November 20, 1972. A discussion of the amount of the excess will be provided in the damages section,
 
 infra.
 

 In determining whether the defendant’s taking of plaintiffs’ grain was wrongful we must analyze the nature of the relationship between tenants in common.
 

 By reason of their community of interest arising from their co-ownership, there exists between cotenants ... a peculiar relationship of mutual trust and confidence in respect to the common estate. This relationship supports a number of presumptions of the utmost favor to all co-tenants to the end that the title and rights of each shall be preserved unimpaired, at least to the extent that no direct or indirect assault on the interest of any one owner shall be made by any other. 20 Am.Jur.2d
 
 Cotenancy & Joint Ownership
 
 § 2.
 

 While the above quotation addresses co-tenancy (a generic term which includes tenancy in common), the tenancy in common has also been specifically so described,
 
 Wheeler v. Taylor,
 
 32 Or. 421, 52 P. 183, 184 (1898) (tenants in common have a “fiduciary relation which demands of each fair dealing in everything pertaining to their interest in the common estate”);
 
 Eternal Cemetery Corp.
 
 v.
 
 Tammen,
 
 324 S.W.2d 562, 564 (Tex.Ct.Civ.App.1959) (implied contract between tenants in common “to exercise their respective rights therein as to avoid injury to the rights of other parties”);
 
 see also Hendrix v. Hendrix,
 
 256 Ark. 289, 506 S.W.2d 848 (1974);
 
 Webster v. Knop,
 
 6 Utah 2d 273, 312 P.2d 557 (1957);
 
 Bayless v. Alexander,
 
 245 So.2d 17 (Miss.1971);
 
 Truver v. Kennedy,
 
 425 Pa. 294, 229 A.2d 468 (Pa. 1967); 86 C.J.S.
 
 Tenancy in Common
 
 § 17. Wisconsin recognizes this duty: “Tenants in common are bound to deal fairly with each other .... ”
 
 Frentz v. Klotsch,
 
 28 Wis. 312, 318 (1871),
 
 see also Wright v. Sperry,
 
 21 Wis. 331 (1867);
 
 Hunter v. Bosworth,
 
 43 Wis. 583 (1878);
 
 Hannig v. Mueller,
 
 82 Wis. 235, 52 N.W. 98 (1892);
 
 Allen v. Allen,
 
 114 Wis. 615, 91 N.W. 218 (1902).
 

 The most common situation in which this duty becomes an issue is when one tenant in common of real property acquires an outstanding tax title and attempts to assert it against the other cotenant(s). Wisconsin has adopted the rule that:
 

 [I]t is not consistent with good faith, nor with the duty which the connection of the parties as claimants of a common subject created, that one of them should be able,
 
 *537
 
 without the consent of the other, to buy in an outstanding title and appropriate the whole subject to himself, and thus undermine and oust his companions,
 
 Van Horne v. Fonda,
 
 5 Jones ch. 388, 396; quoted in
 
 Hunter,
 
 43 Wis. at 592 and
 
 Allen,
 
 91 N.W. at 222.
 

 Thus, where a tenant in common acquires an outstanding tax title, it is either held in trust for the benefit of the other coten-ant(s),
 
 Allen supra,
 
 or the acquisition merely results in the extinguishment of the tax title,
 
 Hannig, supra.
 
 It should be noted that the existence of this duty is not limited to cotenancies involving real property,
 
 see Hunter, supra.
 

 We note, however, the generally accepted caveat to this application of the cotenant’s duty:
 

 If the interests of the cotenants accrue at different times, under different instruments, and neither has superior means of information respecting the state of the title, then either, unless he employs his cotenancy to secure an advantage, may acquire and assert a superior outstanding title, especially where there is no joint possession. [Citations omitted.]
 
 Hodgson v. Federal Oil & Development Co.,
 
 274 U.S. 15, 19-20, 47 S.Ct. 502, 503-504, 71 L.Ed. 901 (1927).
 

 This limitation has been noted with approval by the Wisconsin Supreme Court in
 
 Allen,
 
 91 N.W. at 223
 
 supra; see also Frentz v. Klotsch,
 
 28 Wis. 312, 318.
 

 Our analysis of the Wisconsin cases leads us to the conclusion that the minimum duty imposed on a tenant in common is that he deal with his cotenant in good faith and not intentionally assail the other’s interest. Good faith is commonly defined as:
 

 An honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, notice or benefit or belief of facts which render transaction unconscientious. [Citations omitted.] Black’s Law Dictionary 822 (rev. 4th ed. 1968).
 

 One need not flyspeck the record in the instant case to find evidence of bad faith on the part of the defendant. The trial court found that the government officials were aware of the severe grain shortage and the financial predicament of Grain Finance on November 20,1972.
 
 [16]
 
 With that awareness, the CCC entered loading orders for all its grain as well as the extraordinary order not to reject cars back to the shipper. Additionally, the CCC loans were called without any disclosure of the shortage. None of the three available investigative bodies were informed. The consistent urgency reflected in the communications between the various governmental agencies and between them and Green is further evidence of bad faith. The letter of August 9, 1973 from Cast to Green explicitly authorized an obvious incursion upon the other cotenants’ interests. The bad faith of the defendant is well characterized by the District Court:
 

 [T]he decision ... to withdraw the CCC corn from the warehouse as rapidly as practical without regard to what the consequences might have been for others who had corn in that warehouse, whatever their rights, whatever the nature of their interest may have been in terms of ownership or otherwise, the decision to proceed to take the corn, the CCC corn from the warehouse as rapidly as that could practically be arranged was a decision made by Mr. Cast in consultation with others . . . Tr. pp. 890-891.
 

 Perhaps the most damning evidence of the bad faith of tfie defendant is the
 
 Luther
 
 case. We take judicial notice of the fact that the governmental agency involved in
 
 Luther
 
 was the identical one primarily responsible for the actions taken in the instant case. The operative facts in each case are identical. The CCC was clearly informed in
 
 Luther
 
 of the relative rights of the parties and the wrongfulness of its conduct. Yet when faced with the same situation it proceeded on the same wrongful course of action. Therefore, we conclude
 
 *538
 
 that the evidence is overwhelming that the defendant assailed its cotenants’ interests in bad faith.
 

 Applying the caveat discussed
 
 supra
 
 p. 537, we note that under the terms of the UGSA, the defendant had the right to inspect both the financial records of Grain Finance and the grain stored at the warehouse. The other depositors did not have those rights of inspection. Therefore, the government had superior means of acquiring information as to the status of the cotenants’ interests in the commingled grain. Furthermore, it is clear that the defendant did not disclose that information to the other depositors
 
 [17]
 
 and, in fact, used it to gain an advantage over the other cotenants. We note also that the defendant employed its status as a cotenant to secure an advantage. That is, the government, with knowledge of the severe shortage, used its status as a tenant in common to obtain access to incoming grain and thereby was able to withdraw 100% of the grain represented by its warehouse receipts. The utilization of that advantage was a necessary premise of the “whole-house cleanout” and Cast’s letter of August 9 reveals that the government officials intentionally employed that benefit. Therefore, even under the narrower standard of duty owed between tenants in common, it is evident that the government breached that duty and thus its conduct was wrongful.
 
 [18]
 

 The defendant contends that its conduct was not wrongful because it legally possessed and tendered warehouse receipts for all the grain it received and because it removed that grain pursuant to the lawful termination of the UGSA. As to the warehouse receipts, it is implicit in the
 
 Luther
 
 case that the government cannot rely solely on the warehouse receipts to support the lawfulness of its conduct when it is aware of a severe shortage of grain. Similarly, in the tax deed situation discussed
 
 supra,
 
 a cotenant cannot rely on the tax deed to claim legal title when the acquisition of that deed was inconsistent with the duty of good faith owed between cotenants. This does not conflict with the UCC as adopted by Wisconsin. Wis.Stat. § 407.207(2), quoted
 
 supra,
 
 holds the warehouseman liable for the grain represented by the warehouse receipts, but is silent as to the depositor’s rights vis-a-vis the other depositors. The UCC incorporates common law to the extent it is not inconsistent with the statutory scheme, UCC § 1-103,
 
 [19]
 
 Wis.Stat. § 401.-103. The UCC specifically adopts the status of tenant in common for depositors of commingled fungible goods, and there appears no inconsistency in applying the common law duty inherent in that relationship. We note that § 1-203 of the UCC (Wis. Stat. § 401.203) provides:
 

 Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.
 

 This provision, in conjunction with § 1-103, has been construed to “superimpose a general requirement of fundamental integrity in commercial transactions regulated by the [Uniform Commercial] Code,”
 
 Skeels v. Uni
 
 
 *539
 

 versal C.I.T. Credit Corp.,
 
 335 F.2d 846, 851 (3d Cir.1964).
 

 Our holding does not conflict with § 7-205 of the UCC (Wis.Stat. § 407.205):
 

 A Buyer in the ordinary course of business of fungible goods sold and delivered by a warehouseman who is also in the business of buying and selling such goods takes free of any claim under a warehouse receipt even though it has been duly negotiated.
 

 By its terms, this statute provides “special protection only for buyers in the ordinary course of business,” 3A Bender’s Uniform Commercial Code Service § 10.07[2][c]. The UCC defines “buyer in ordinary course of business” as,
 

 [A] person who
 
 in good faith and without knowiedge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods
 
 buys in ordinary course from a person in the business of selling goods of that kind .. . (Emphasis supplied.) UCC § 1-201(9),
 
 see
 
 Wis.Stat. § 401.201(9).
 

 It is clear that the defendant does not qualify as a buyer in the ordinary course. Additionally, our holding is not inconsistent with the underlying rationale stated in the official UCC comment to § 7-205,
 

 [O]n default of the warehouseman, the receipt holders at least share in what grain remains, whereas retaking the grain from a good faith cash purchaser reduces him completely to the status of general creditor in a situation where there was very little he could do to guard against the loss.
 

 Furthermore, we are not holding that a depositor who obtains delivery pursuant to valid warehouse receipts in good faith should be held liable if it is subsequently discovered that at the time of delivery there was a severe shortage. In that situation there would be no violation of the duty between cotenants and thus the taking would not be wrongful.
 

 The defendant also contends that its withdrawal of the grain was not wrongful because it was pursuant to the lawful termination of the UGSA pursuant to Green’s written request. This claim is entirely without merit. The UGSA had no provision authorizing unilateral termination by Green except on the annual renewal date, i.e., July l.
 
 [20]
 
 While the agreement did permit termination by mutual consent,
 
 [21]
 
 the stipulation of facts states that the UGSA “was never formally terminated.” Furthermore, in his letter of August 9, 1973, to Green, Cast stated:
 

 We trust you ... will operate in accordance with the Agreement until such time as all of your obligations to CCC have been satisfied and we can terminate the Agreement per mutual consent.
 

 The acts of removing Grain Finance from the approved list of warehouses and the issuance of loading orders did not constitute
 
 de facto
 
 termination because those actions are specifically authorized by the UGSA
 
 *540
 
 without the necessity of termination.
 
 [22]
 
 Thus, the defendant’s argument that it was compelled to remove its grain pursuant to the alleged termination by Green is without merit.
 

 Having concluded that the plaintiffs demonstrated that the defendant wrongfully took property owned by the plaintiffs, conversion is the appropriate remedy. As stated in
 
 Leach v. Kelsch,
 
 106 N.W.2d 358 (N.D.1960):
 

 That a tenant in common may maintain an action against a cotenant to recover the value of a joint interest in personal property, to the actual possession of which he is entitled, at a time when his rights of ownership and possession are denied and ignored in a manner which deprives him of the possibility of any enjoyment thereof or benefit therefrom, is supported by both reason and authority, 106 N.W.2d at 364 quoting
 
 Hochstatler v. Graber,
 
 [78 N.D. 90] 48 N.W.2d 15, 18 (1951).
 

 This is settled law, see 86 C.J.S.
 
 Tenancy in Common
 
 § 81; and has been recognized in Wisconsin,
 
 Warren v. Allen,
 
 1 Pinney 479 (Wis.1845),
 
 Tallman v. Barnes,
 
 54 Wis. 181, 11 N.W. 478 (1882);
 
 Wood v. Noack,
 
 84 Wis. 398, 54 N.W. 785 (1893);
 
 Sullivan v. Sherry,
 
 111 Wis. 476, 87 N.W. 471 (1901).
 

 The defendant contends that the plaintiffs cannot prevail on a theory of conversion because they lack the requisite possessory rights. An essential element of conversion under Wisconsin law is that the plaintiff have possession or have an immediate right to possession of the chattel,
 
 Production Credit Assn. of Madison v. Nowatzki,
 
 90 Wis.2d 344, 280 N.W.2d 118 (1979).
 
 Production Credit
 
 involved a plaintiff who had only a security interest in the chattel which would ripen into a right of possession upon default by the borrower, an event that had not occurred. In the instant case, the plaintiffs were tenants in common of the goods, and it is axiomatic that possession or the present right to possession is an essential element of a tenancy in common, 20 Am.Jur.2d
 
 Cotenancy and Joint Ownership
 
 § 23; 86 C.J.S.
 
 Tenancy in Common
 
 § 5. The fact that the goods were in the possession of a bailee, i.e., the warehouseman, does not affect that right. The defendant cites
 
 South Dakota Wheat Growers Assn. v. Farmer’s Grain Co.,
 
 58 S.D. 480, 237 N.W. 723 (1931) for the proposition that a demand by the plaintiffs was necessary in the instant case. However, that case simply stated that a demand is an essential element of an action for conversion by a depositor against a warehouseman. That rule was based on the rationale that possession by the'bailee is authorized, and thus lawful, until the bailor has terminated the authorization by a demand for possession. This is consistent with Wisconsin law:
 

 Where ... there is no wrongful taking and the defendant rightfully comes into possession of the chattels, a demand by the rightful owner and a refusal by the alleged tortfeasor are necessary elements of the tort,
 
 Production Credit, supra,
 
 280 N.W.2d at 123.
 

 In the case
 
 sub judice,
 
 we have determined that the taking was demonstrated to be wrongful and therefore a demand for possession is not an essential element of the tort.
 

 
 *541
 
 THE DISCRETIONARY FUNCTION EXCEPTION
 

 Appellee contends that even assuming the commission of a tort by the government, it is not liable under FTCA because of the discretionary function exception, 28 U.S.C. § 2680(a).
 
 [23]
 
 The government argues that Cast’s decision to terminate the UGSA with Grain Finance and to order the load-out involved a policy choice made on a planning or administrative level of government and thus within the discretionary function exception as construed in
 
 Dalehite v. United States,
 
 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In that case, the Court provided the following guidance for determining the scope of the exception:
 

 It is the discretion of the executive or the administrator to act according to one’s judgment of the best course ... [It] includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. [Footnote deleted.]
 
 Id.
 
 at 34-36, 73 S.Ct. at 967-968.
 

 Based on this language this circuit takes the position that the applicability of the exception rests upon the characterization of the challenged behavior as either a policy decision or an operational decision,
 
 American Exchange Bank of Madison v. United States,
 
 257 F.2d 938, 941 (7th Cir.1957);
 
 Emch v. United States,
 
 630 F.2d 523, 527 (7th Cir.1980),
 
 cert. denied,
 
 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981);
 
 Estate of Callas v. United States,
 
 682 F.2d 613, 620 (7th Cir.1982). Other circuits also utilize this distinction, or similar formulations, as a guideline,
 
 see id.
 
 at 620.
 

 We cannot agree that Cast’s conduct in ordering the load-out falls within these guidelines. Certainly many aspects of the Department of Agriculture’s price support program involve discretionary decisions. However, by executing the UGSA, which specifically provided that the grain would be commingled, and by its conduct in ratifying the commingling the government chose to accept the status of tenant in common with the other grain depositors. Having made that decision, which certainly was discretionary, the government cannot now repudiate the duties imposed by that relationship under the guise of a policy decision. We must assume that when the government executed the UGSA and accepted the role of cotenant with the depositors that it had lawful motives and intended to be bound by the duties imposed by state law on such property holders. Thus, to the extent that state law imposed duties on cotenants, there was no “discretion [on the part] of the executive or the administrator to act according to one’s judgment of the best course ...”
 
 Dalehite, supra.
 

 This is not a novel holding. In
 
 McGarry v. United States,
 
 549 F.2d 587 (9th Cir.1976), the plaintiff sued the government for the wrongful death of her husband. The decedent had been an employee of Reynolds Electrical & Engineering Co. (REECO), an independent contractor which was performing work for the Atomic Energy Commission (AEC) at the Nevada Test Site. The decedent was electrocuted while performing work at that site and his widow sued REE-CO and the federal government for negligence. The government claimed sovereign immunity under the discretionary function exception, relying on
 
 Blaber v. United States,
 
 332 F.2d 629, 631 (2d Cir.1964), in which the court had stated:
 

 [W]hen the [Atomic Energy] Commission decides the extent to which it will undertake to supervise the safety procedures of private contractors, it is exercising discretion at one of the highest planning levels.
 

 However, the court in
 
 McGarry
 
 concluded that the discretionary function exception was inapplicable:
 

 Under its contract with REECO, as we have heretofore quoted it, AEC did not disassociate itself from all matters of safety or disclaim any function or concern
 
 *542
 
 in that respect. It reserved to itself the right to inspect the work and activities of REECO and to stop all work should REE-CO fail to comply with health, safety and fire protection requirements. Four AEC employees were engaged in the review of REECO’s safety program.
 

 As a matter of policy, then, the AEC chose to retain some responsibility over matters of employee safety. The meeting of that responsibility was an operational function. The manner in which responsibility was to be met was the subject of decision at the operational rather than the planning level, and accordingly was not an exercise of a discretionary function. It must, then, meet the requirements of Nevada law. 549 F.2d at 591.
 

 See also, State of Maryland v. Manor Real Estate & Trust Co.,
 
 176 F.2d 414, 419 (4th Cir.1949) (United States as landlord not exempt under discretionary function exception from state-imposed duty of keeping premises safe for tenants);
 
 United States v. White,
 
 211 F.2d 79 (9th Cir.1954) (United States as landowner not exempt under discretionary function exception from duty to warn business invitees of known dangers on property);
 
 Smith v. United States,
 
 546 F.2d 872 (10th Cir.1976) (United States as landowner not exempt under discretionary function exception from duty to warn persons of known dangers on property).
 

 In the case
 
 sub judiee,
 
 the CCC chose, as a matter of policy, to store its grain in public warehouses with the grain of other depositors. Once that decision was made, the meeting of its responsibilities to the other depositors became operational, subject to the laws of Wisconsin and not to the discretion of government officials. As stated in
 
 Smith
 
 v.
 
 United States,
 
 546 F.2d 872, 877 (10th Cir.1976):
 

 If we were to accept the Government’s broad interpretation of the discretionary exception, it is difficult to perceive which duties under tort law could not be avoided by a similar policy decision to ignore them.
 

 This Court has recently noted that the purpose of the discretionary function exception is to prevent unwarranted intrusions by the courts into the decision-making processes of other branches of government,
 
 Estate of Callas, supra,
 
 682 F.2d at 620. The types of decisions it is meant to immunize are:
 

 [Djecisions that involve the formation of policy, that call for a weighing of competing interests, that require an assessment of the practicability or feasibility (including the consideration of budgetary constraints) of a proposed course of action, or that entail an evaluation of how the public interest will best be served. [Citations omitted.]
 
 Id.
 
 at 620.
 

 The decision by the CCC in the case
 
 sub judiee
 
 can hardly be elevated to such a level. It was nothing more than a purely self-interested pecuniary decision such as an unscrupulous businessman would make. Furthermore, we do not see how our holding can be construed as an unwarranted intrusion into the decisionmaking authority of the government. Congress has specifically waived sovereign immunity for cases in which the United States is a cotenant of real property, 28 U.S.C. § 2409,
 
 [24]
 
 apparently finding it no great imposition to comply with local law in those circumstances. Moreover, considering the limited holding of this case, it hardly seems an onerous burden to require the government to deal in good faith and not to assail the interests of parties with whom it chooses to be a coten-ant.
 

 COLLATERAL ESTOPPEL
 

 The plaintiffs contend that the district court erred in ruling that they were
 
 *543
 
 collaterally estopped from litigating the issue of whether title to the corn subject to the price later contracts passed to the warehouseman. A bankruptcy judge, in the proceedings involving Grain Finance and FGX, concluded that title to the corn passed to the warehouseman at the time the contract was executed. The application of that ruling to the instant case meant that the plaintiffs had no standing to assert conversion as to that grain.
 

 It is undisputed that the issue before the bankruptcy court was identical to that raised in the district court and that all arguments presented to the district judge on the merits had been raised in the bankruptcy proceedings. There is no claim that there was newly discovered evidence to present to the district court. The plaintiffs argue that the alignment of the parties and the small amount in controversy in the bankruptcy suit prevented the plaintiffs from having an adequate opportunity or incentive to obtain a full and fair adjudication. The alignment of the parties was not fortuitous, however, but was the result of a voluntary decision by the farmers to consolidate their claims. There is no allegation that they were not informed of the conflict of interest raised by the issue of the price later contracts. In view of all the circumstances, we cannot conclude that the district court erred in ruling that the plaintiffs had a full and fair opportunity to raise their claim in the bankruptcy proceeding and were therefore collaterally estopped from relitigating that issue.
 

 DAMAGES
 

 The final issue to be addressed is damages. The plaintiffs contend, and the district judge apparently agreed, that the plaintiffs had failed to prove their damages. This was based on the theory that the plaintiffs would have to. show that on each day grain was delivered to the defendant, it was receiving more than its
 
 pro rata
 
 share computed as of that date. This would require the plaintiffs to compute defendant’s share for each of those delivery dates, a task which they conceded was financially impractical and, based on the available records, probably impossible. This court has stated:
 

 ... a defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.
 
 Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,
 
 633 F.2d 477, 484 (7th Cir.1980), citing
 
 Eastman Kodak Co. v. Southern Photo Materials Co.,
 
 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).
 

 We believe a proper measure of damages would be to hold defendant liable for the value of all grain taken in excess of its
 
 pro rata
 
 share as of November 21, 1972. That was the date on which the defendant issued the first loading order and thereby began assailing the other cotenants’ interest in bad faith. To the extent the defendant obtained any grain in excess of its
 
 pro rata
 
 share as of that date, it did so in violation of its duty to the other cotenants. Contrary to defendant’s suggestion, this is not strictly an equitable measure of damages. As conceded by defendant “a tenant in common ... may be held liable in conversion only for the amount taken in excess of its legal share,” citing,
 
 Wood v. Noack,
 
 84 Wis. 398, 54 N.W. 785 (Wis.1893);
 
 Trustees of Ashland Lodge No. 63, I.O.O.V. v. Williams,
 
 100 Wis. 223, 75 N.W. 954 (1898).
 

 We note that for purposes of determining the government’s
 
 pro rata
 
 share, the price later obligations must be utilized in determining the extent of the shortage. While the warehouse obtained title to the grain at the time it entered the contracts, it thereby became a cotenant in the common mass to the extent of its interest,
 
 James v. Plank,
 
 48 Ohio St. 255, 26 N.E. 1107 (1891);
 
 Drudge v. Leiter,
 
 18 Ind.App. 694, 49 N.E. 34 (1898);
 
 United States v. City of Jacksonville,
 
 167 F.2d 366 (5th Cir.1948). Thus, a shortage of the grain subject to the price later contracts was of the same consequences as a shortage of the other commingled grain for purposes of determining each cotenant’s share.
 

 
 *544
 
 Accordingly, the decision of the district court is reversed and the cause is remanded for further proceedings consistent herewith.
 
 [25]
 
 Rule 18 shall apply.
 

 [1]
 

 . It appears that for purposes relevant to this case these corporations were actually a unified business entity. The parties stipulated that Grain Finance and FGX operated at the same location and submitted consolidated financial statements to the defendant for the years 1967-1972 (no financial statements were submitted after 1972). A government report dated April 27, 1973 stated that all the grain of the corporations was commingled. Furthermore, we note that the parties’ Stipulation of Facts only presents figures for the combined grain inventory and obligations of these corporations. Thus, while only Grain Finance entered into an agreement with the defendant to be an authorized depository, we must consider the operations of both corporations for purposes of this case.
 

 [2]
 

 . CCC is the agency of the United States Department of Agriculture which was established by Congress “for the purpose of stabilizing, supporting and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities . . . and of facilitating the orderly distribution of agricultural commodities,” 15 U.S.C. § 714. One method used to support farm prices is non-recourse loans to farmers. These loans are collateralized by the farmer’s grain, and the CCC looks only to that grain for satisfaction of the loan. The farmer may repay the loan with interest at any time prior to maturity; if he does not repay, the CCC takes title to the grain, the loan is satisfied, and the farmer pays no interest. The CCC can also “call” the loan, giving the farmer the option of either surrendering the grain or paying the loan and retrieving the grain.
 

 [3]
 

 . Grain Finance had been a CCC-approved depository since 1957 under previous UGSAs.
 

 [4]
 

 . AMS is an agency of the United States Department of Agriculture which conducts examinations of the grain warehouses and reviews their financial records, see 7 C.F.R. § 2.50.
 

 [5]
 

 . Price later obligations arise out of contracts between depositors and warehousemen which provide for the subsequent payment to the farmers for the grain at futures prices higher than the market price at the time of the execution of the contract.
 

 [6]
 

 . Attached to the report was a handwritten list, apparently prepared by Green, which indicated that the total number of bushels owed under price later contracts was 337,210.
 

 [7]
 

 . Two witnesses testified at trial that in the fall of 1972 Craig and another examiner used the phone at the Union Co-op warehouse to report that Grain Finance was in a “hell of a mess.” Tr. pp. 149-164, 179.
 

 [8]
 

 . ASCS is an agency of the United States Department of Agriculture which administers the price support program of the CCC.
 

 [9]
 

 .
 
 See
 
 fn. 2
 
 supra.
 

 [10]
 

 . The plaintiffs and the defendant differ as to the significance of the price later contracts. The defendant construes them as creating only a monetary obligation on the part of the warehouse and not a storage obligation. The plaintiffs argue that in addition to the monetary obligation, the contracts created a bushel obligation until the time that the grain was actually sold by the warehouse with the consent of the farmer. We note that Craig’s report listed the price later obligations on the reverse side of form TW-308 entitled “Storage Obligations Not Covered by Warehouse Receipts.” Also the financial statements submitted by Grain Finance and FGX to the defendant did not represent any amounts due on the price later contracts. This dispute is not crucial to the issue of the defendant’s knowledge of the conditions at Grain Finance as of November of 1972. Assuming
 
 arguendo
 
 that the price later contracts only created a monetary obligation, the huge extent of the money owed and the inability of Grain Finance to satisfy those debts was obvious from the information the defendant had at that time. But see discussion “Damages”
 
 infra.
 

 [11]
 

 . Cast testified that there had been prior occasions on which the ASCS had notified a state department of agriculture that a warehouse was in trouble, Cast depo. p. 100.
 

 [12]
 

 . This obligation was extinguished by a cash offset against the accumulated storage charges CCC owed Grain Finance.
 

 [13]
 

 . The parties submitted a 49-page Stipulation of Facts which was well organized and quite detailed. The parties should be congratulated for this laudable effort to reduce the burden on the district court.
 

 [14]
 

 . The district court found that the plaintiffs had not sustained their burden of proving that
 
 *534
 
 Cast had induced Green to write the letter of November 20, 1972. We do not find that the district court’s decision was clearly erroneous.
 

 [15]
 

 . 28 U.S.C. § 2680(a) provides an exemption for
 

 Any claim based upon an act or omission of an employee of the Government .. . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 

 [16]
 

 . It is implicit in the district court’s findings that Craig’s superiors were not convinced by his recomputation of the grain shortage as approximately 13,000 bushels.
 

 [17]
 

 . This statement should not be construed as being inconsistent with this Court’s prior opinion in this cause in which it was determined that liability could not be predicated on the government’s failure to disclose accurate information regarding Grain Finance to the plaintiffs,
 
 see Preston v. United States,
 
 596 F.2d 232, 236-239. The government’s failure to reveal the information on Grain Finance is relevant and admissible on the factual issue of its bad faith and we have considered it only for that limited purpose.
 

 [18]
 

 . For purposes of the FTCA we need only decide whether the acts of the government constituted a tort under the law of the place where the acts or omissions occurred, see 28 U.S.C. § 1346(b). We have determined that even under the narrower standard of duty owed between cotenants the government’s conduct was wrongful. We decline to decide, however, which of the two standards must apply in this situation. That issue is best left for the state courts to determine in an appropriate case.
 

 [19]
 

 . UCC § 1-103 provides:
 

 Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
 

 [20]
 

 . Paragraph 20(a) of UGSA provided:
 

 (a) Termination of Agreement — If misrepresentations have been made by the warehouseman in his Application of Approval of Warehouse or if the warehouseman fails to load out any of the grain in accordance with the terms of this agreement and with shipping instructions issued by CCC, CCC shall have the right, unless such failure is excused by law, to terminate this agreement with respect to any or all of the warehouses covered hereby, and if either of the parties hereto default in the performance of any other provision of this agreement, the other party, if such default is not cured within fifteen (15) days after a written notice is mailed to the party in default, shall have the right to terminate this agreement with respect to the warehouse(s) involved without thereby being deprived of any claim for damage on account of such default. If this agreement is terminated by mutual consent or for cause, or either party elects to terminate this agreement on any annual renewal date, and, if on the effective date of such termination there is stored in the warehouse grain on which the accrual of charges for the account of CCC has not ceased, CCC shall thereafter pay charges at the rates in the Schedule of Rates or at the warehouseman’s applicable tariff or posted rate, whichever is lower, until such grain is removed or otherwise disposed of.
 

 [21]
 

 .
 
 See
 
 fn. 20,
 
 supra.
 

 [22]
 

 . Paragraph 20(b) of the UGSA provided:
 

 (b) Approved List — CCC shall have the right, subject to the provisions of any applicable regulations of CCC governing suspension and debarment, to remove the warehouse from the list of warehouses approved by CCC for price support purposes with or without terminating this agreement as provided in (a) of this section 20.
 

 Paragraph 11(a) of the UGSA provided:
 

 11. Loadout And Delivery Requirements—
 

 (a) Where Made — When required by CCC, the warehouseman shall, unless prevented by circumstances beyond his control, promptly deliver the grain ordered shipped by CCC pursuant to the provisions of this section 11
 

 Paragraph 5(c) of the UGSA provided:
 

 (c) Limitations — Storage Period — Nothing in this agreement shall be construed as obligating CCC to tender grain to the warehouseman for storage or handling. The storage period for the grain shall be at the option of CCC or the holder of the warehouse receipt unless otherwise mutually agreed in writing.
 

 [23]
 

 .
 
 See
 
 fn. 15,
 
 supra.
 

 [24]
 

 . 28 U.S.C. § 2409 provides in part:
 

 Any civil action by any tenant in common or joint tenant owning an undivided interest in lands, where the United States is one of such tenants in common or joint tenants, against the United States alone or against the United States and any other of such owners, shall proceed, and be determined, in the same manner as would a similar action between private persons.
 
 See Prater v. United States,
 
 612 F.2d 157, 158 (5th Cir.1980).
 

 [25]
 

 . Since the district court granted defendant’s on in this opinion were derived almost exclu-Motion to Dismiss at the close of plaintiffs’ sively from the parties’ “Stipulation of Facts” case, the defendant should be permitted an and the trial court’s findings of facts, and thus opportunity to present additional evidence on further evidence may be unnecessary, the issue of liability. However, the facts relied